**UNITED STATES of America, Appellee,**

v.

**James A. SAETTELE, Appellant.**

**No. 77–1976.**

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1978.

Decided Sept. 13, 1978.

Rehearing and Rehearing En Banc Denied Oct. 2, 1978.

Norman S. London of London, Greenberg & Fleming, St. Louis, Mo., for appellant; Thomas F. Flynn, St. Louis, Mo., on brief.

Ronald E. Jenkins, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief.

Before LAY and BRIGHT, Circuit Judges, and VAN SICKLE,* District Judge.

LAY, Circuit Judge.

James A. Saettele was convicted in a bench trial on two counts of conspiracy and of knowingly receiving, concealing, storing and selling stolen goods moving in interstate commerce in violation of 18 U.S.C. §§ 371, 2315 (1976).[1] On appeal he contends that his motion for judgment of acquittal should have been granted because the evidence clearly established that he was acting under duress. Saettele also contends that the district court erred in refusing to grant immunity to two defense witnesses whose testimony he claimed would verify his defense of duress. We affirm.

The indictment returned against Saettele alleged that he, in conspiracy with Joseph McGirr and Thomas Sargis, had received

---

* Bruce M. Van Sickle, United States District Judge, District of North Dakota, sitting by designation.

1. Saettele was sentenced to serve concurrent terms of three years imprisonment on each count.

and attempted to sell approximately 200 pieces of stolen jewelry. McGirr, testifying under a grant of immunity from prosecution, was the Government's key witness at trial. He related that on February 5, 1976, he, Thomas Sargis and Russell Briddle broke into the apartment of a jewelry dealer in Miami Beach, Florida, and stole approximately 200 pieces of jewelry. In an attempt to sell the jewelry the three men went to St. Louis where they were introduced to Saettele by Marshall Chappel, a part-time jeweler and acquaintance of Saettele.

McGirr testified that Saettele liked the jewelry but did not have enough money to purchase it. At a second meeting, however, Saettele informed McGirr, Sargis and Chappel that he thought he could get the money to purchase the jewelry. He gave McGirr and Sargis $4,000 in cash, the title to two automobiles, and a diamond ring, and in return he received bracelets worth about $40,000.

After an unsuccessful trip to Miami for the purpose of borrowing money from another jewelry dealer, Saettele met again with McGirr and Sargis. McGirr stated that at this meeting an agreement was reached in which Saettele would sell the jewelry on consignment. Under the terms of the deal, Saettele would take most of the jewelry for a $10,000 down payment and would pay an additional $40,000 for it as he sold it. McGirr and Sargis returned the car titles and diamond ring to Saettele but kept the $4,000 cash. Saettele apparently used the car titles to obtain a $6,000 loan, which he gave to McGirr and Sargis to complete the $10,000 down payment. At this point Saettele received substantially all of the jewelry.

Subsequent to the exchange, FBI agents contacted Saettele concerning the stolen jewelry. During the interview, Saettele denied knowing Sargis and McGirr. Afterwards, he located Sargis and returned all the unsold jewelry. The jewelry remained in Sargis' possession until his arrest in St. Louis on June 1, 1976.

At trial Saettele based his defense on his claim that he had been coerced into going along with the fencing operation because of threats made against the lives of himself and his family. He testified that when Marshall Chappel first contacted him about the jewelry, Chappel told him that the jewelry came from a retired jeweler who wanted to sell his collection. When Saettele later met with McGirr and Sargis in March 1976, he began to suspect that the jewelry was stolen and tried to leave. He was stopped by McGirr, who told him the jewelry was "hot" and threatened to kill Saettele and his family if he tried to back out of the transaction or go to the police. Both McGirr and Sargis were armed with guns.

In May 1976, when subpoenaed to testify before the grand jury, Saettele rejected a government offer of immunity and refused to testify on fifth amendment grounds. At trial he explained that he refused the offer of immunity because he feared McGirr and Sargis would harm him or his family if he testified.

Saettele's wife corroborated his story. She testified that when Saettele told her of his involvement, she suggested that he go to the police. She further testified that Saettele replied that he could not because McGirr and Sargis had threatened to kill him and his family if he said anything about the stolen jewelry. The Government also stipulated that two other witnesses, a friend of Mrs. Saettele's and Mrs. Saettele's mother, would testify that Mrs. Saettele had related to them that McGirr and Sargis had threatened to kill her husband and the rest of his family if he told anyone about the stolen jewelry.

Saettele also called Thomas Sargis and Marshall Chappel as witnesses on his behalf. Both men were present in the courtroom, Chappel under subpoena and Sargis under a writ of habeas corpus ad testificandum. When Chappel was called to the stand, the prosecutor informed the court that Chappel might refuse to testify on fifth amendment grounds. A bench conference disclosed that the prosecutor had, until the prior evening, been prepared to grant Chappel immunity

in order to secure his testimony as a government witness. Although time constraints prevented the prosecutor from obtaining a formal grant of immunity under 18 U.S.C. §§ 6002, 6003 (1976), Chappel agreed to testify if he received a letter from the acting United States attorney declining prosecution. That evening, however, Chappel made statements supporting Saettele's duress contentions. The prosecutor informed Saettele's counsel of these statements, decided not to call Chappel as a witness, and withdrew the offer of immunity.

As anticipated, both Chappel and Sargis asserted their fifth amendment privilege and refused to testify. Saettele made a motion to compel the testimony of the witnesses and asked the court either to grant them immunity or to compel the Government to seek immunity for them. In support of this motion, Saettele introduced a stipulation that an attorney associated with his trial counsel would, if called to the stand, testify that he had interviewed Sargis and Chappel and both had told him that they had threatened Saettele with death if he did not go through with the fencing scheme.

The district court denied Saettele's motion, ruling that it did not have inherent power to grant witnesses immunity when the Government did not apply for it. Saettele thereupon made a motion to strike McGirr's testimony and a motion to dismiss the prosecution because of the unfairness of the Government's refusal to grant immunity to his witnesses. The district court denied both motions and subsequently found Saettele guilty.

Saettele argues that the evidence presented in support of his asserted defense of duress requires a judgment of acquittal. We disagree. In order to successfully raise the defense of duress a defendant in a criminal case must show a reasonable fear of death or serious bodily injury and the absence of a reasonable opportunity to escape or avoid the threatened danger.[2] *United States v. Gordon,* 526 F.2d 406, 407 (9th Cir. 1975). *See United States v. Hearst,* 563 F.2d 1331, 1335 n.1 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *United States v. Michelson,* 559 F.2d 567, 569 (9th Cir. 1977); *United States v. Patrick,* 542 F.2d 381, 386 (7th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

Assuming arguendo that the evidence presented was sufficient to establish a reasonable apprehension of injury, nothing in the record suggests that Saettele made any attempt to escape or avoid the threatened danger or was prevented from doing so at any time. In fact Saettele's testimony establishes the opposite.

Saettele testified that he first received the threat in early March 1976. Saettele then testified that the day after receiving the threat he flew alone to Miami. Following his return he informed his wife, who suggested that he go to the police. In addition Saettele stated that after his interview with the FBI, his contacts with McGirr and Sargis were "off and on." In sum nothing in the record supports any claim that the threat of injury was immediate. *See United States v. Patrick,* 542 F.2d 381, 386–88 (7th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

Our disposition of this issue renders it unnecessary for us to determine whether or not the district court erred in denying Saettele's motions concerning immunity for Sargis and Chappel. Even assuming Sargis and Chappel would have corroborated Saettele's testimony[3] we agree with the district

---

**2.** The classic definition of duress is contained in *Shannon v. United States,* 76 F.2d 490, 493 (10th Cir. 1935):

Coercion which will excuse the commission of a criminal act must be immediate and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. One who has full opportunity to avoid the act without danger of that kind cannot invoke the doctrine of coercion . . . .

**3.** This is a large assumption. Both Sargis and Chappel previously had informed the prosecution that neither Saettele nor his family were threatened or forced to buy any jewelry.

court that "it is clear that defendant had many opportunities to escape and thus, the defense of duress is not available." Saettele's own testimony negates the element of inescapability.

The judgment of conviction is affirmed.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent. For reasons stated below, I believe this court must consider and accept in part Saettele's contention that he was denied a fair trial because the Government immunized its chief witness but declined to offer immunity to Saettele's witnesses.

The district court stated three grounds for denying Saettele's motions regarding immunity for Sargis and Chappel. The court first asserted that it had no inherent power to grant witnesses immunity from prosecution. In a later memorandum opinion, the court stated that even if it possessed the power, granting immunity in the present case would be inappropriate because (1) immunity from federal prosecution would not necessarily compel the witnesses to testify because they might still be subject to state prosecution and (2) the testimony of Sargis and Chappel was immaterial because Saettele was not entitled to the defense of duress.

I cannot agree with the majority's conclusion that, as a matter of law, Saettele was not entitled to the defense of duress as a basis for affirming the district court. The district court concluded that Saettele "had many opportunities to escape and, thus, the defense of duress is not available." The district court drew this conclusion, however, before receiving all available evidence on this issue. If the testimony of Chappel and Sargis corroborated Saettele's testimony, it might have bolstered Saettele's credibility and shed more light on the nature and extent of the alleged duress. On the present state of the record we have no way of knowing whether the witnesses' testimony would have supported Saettele's duress claim. Because the district court prematurely concluded that the defense was not available, that conclusion constituted an in-

sufficient basis for rejecting the testimony of Chappel and Sargis and is, in my opinion, an improper basis for an affirmance by this court.

The district court also stated that the possibility of state prosecution might deter Chappel and Sargis from testifying even if immunity were granted. I disagree with this hypothesis. Immunity granted by a federal court extends to state as well as federal prosecutions. See *Kastigar v. United States*, 406 U.S. 441, 456–59, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Commission*, 378 U.S. 52, 78–79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *United States v. Watkins*, 505 F.2d 545 (7th Cir. 1974); *United States v. Armstrong*, 476 F.2d 313 (5th Cir. 1973). Therefore, Sargis and Chappel, upon being granted immunity, could not use fear of state prosecution as a basis for invoking their fifth amendment privilege.

The district court's final basis for denying Saettele's motion—that it lacked the power to grant immunity or to compel the prosecution to do so—presents greater difficulty, for it raises important questions of conflicting constitutional rights and responsibilities.

The compulsory process clause of the sixth amendment guarantees a defendant's right to secure the testimony of witnesses on his or her behalf, a right that plays a fundamental role in our system of criminal justice. The Supreme Court recently emphasized the importance of the compulsory process clause in *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974):

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that com-

pulsory process be available for the production of evidence needed either by the prosecution or by the defense.

The compulsory process clause assures not only the right to compel the attendance of witnesses but also the right to secure their testimony:

[T]he petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense. The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use. [*Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967) (footnote omitted).]

*See* Westen, *The Compulsory Process Clause*, 73 Mich.L.Rev. 71 (1974).

A defendant does not, however, have an absolute right to compel testimony, for a witness may refuse to testify on the ground that the testimony may be incriminating. The fifth amendment right against compulsory self-incrimination "reflects * * * our fundamental values and aspirations, and marks an important advance in the development of our liberty." *Kastigar v. United States, supra*, 406 U.S. at 444, 92 S.Ct. at 1656 (footnote omitted); *accord, Murphy v. Waterfront Commission, supra*, 378 U.S. at 55, 84 S.Ct. 1594 (1964); *Ullman v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

The conflict between these two essential rights has led to the enactment of statutes empowering prosecutors to afford immunity to witnesses who invoke their fifth amendment rights. Such statutes "seek a rational accommodation between the imperatives of the [fifth amendment] privilege and the legitimate demands of government to compel citizens to testify." *Kastigar v. United States, supra*, 406 U.S. at 446, 92 S.Ct. at 1657. At issue in the present case are the immunity provisions of 18 U.S.C. §§ 6002, 6003 (1976).[4] Under section 6002, a witness may be compelled to testify by granting "use immunity," *i. e.*, no testimony given under the grant of immunity may be used against the witness in a criminal case. Section 6003 provides the procedure to fol-

---

4. Section 6002 provides:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

Section 6003 provides:

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

(1) the testimony or other information from such individual may be necessary to the public interest; and

(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

low in seeking immunity. The United States attorney, upon determining that the testimony is necessary to the public interest, must first obtain the approval of the Attorney General and then must seek a court order compelling the witness to testify, subject to the immunity provisions of section 6002. The court's power is limited: "The court's role in granting the order is merely to find the facts on which the order is predicated." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News pp. 4007, 4018.

Because the authority to seek immunity under section 6002 can be exercised only by the *prosecutor*, the statute does not always achieve its purpose of accommodating the conflicting rights of the *defendant* and the witness. Such is the case before us. Under the circumstances of this case, I believe the constitutional demands of a fair trial required the prosecutor to grant immunity to the defense witnesses or the district court to take steps to rectify the unfairness created by the Government's one-sided grant of immunity only to its own witness.

The very essence of the due process clause of the fifth amendment, as well as the sixth amendment in its entirety, is the assurance of a fair trial for criminal defendants. The importance of this requirement cannot be overstated, for

> [s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. [*Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).]

Courts have repeatedly held that government suppression of evidence favorable to the defendant violates the defendant's right to due process. In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. (1957), the Supreme Court concluded that the trial court erred in permitting the Government to withhold the identity of an informant who would have been the defendant's sole material witness. The Court noted that the scope of the Government's privilege to withhold the identity of infor-

mants is limited by "the fundamental requirements of fairness" and the defendant's "right to prepare his defense." *Id.* at 60, 62, 77 S.Ct. 623. The Court remanded for further proceedings. In *Brady v. Maryland, supra*, 373 U.S. at 87, 83 S.Ct. 1194, the Court held that a prosecutor must disclose evidence favorable to the defendant; failure to do so, even in good faith, violates the requirements of due process. The Court remanded for retrial. The Third Circuit reached a similar conclusion in *United States ex rel. Almeida v. Baldi*, 195 F.2d 815 (3d Cir. 1952). The court affirmed the grant of a writ of habeas corpus on the ground that "suppression of evidence favorable to Almeida was a denial of due process." *Id.* at 820.

A refusal to offer immunity to defense witnesses may amount to suppression of exculpatory evidence under some circumstances. Only the Third Circuit has ordered a grant of immunity in such a case. In *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976), the prosecutor had intimidated the defendant's primary witness to the point where she invoked her fifth amendment privilege. The court held that the prosecutor's actions violated the defendant's right to due process. It ordered that upon retrial the Government must either request immunity for the witness or the trial court must enter a judgment of acquittal. Three other circuit courts, while holding that the trial court lacked the power to grant immunity to defense witnesses under the circumstances before them, have speculated that under different circumstances such a power might exist. In *Earl v. United States*, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), the District of Columbia Circuit refused to order immunity for a defense witness. Judge (now Chief Justice) Burger, writing for the court, contrasted the circumstances with those existing in *Brady* and noted that the Government had not suppressed any evidence. In a footnote, however, he suggested that immunity may be required if the Government had granted immunity to its own witnesses:

We might have quite different, and more difficult, problems had the Government in this case secured testimony from one eyewitness by granting him immunity while declining to seek an immunity grant for Scott to free him from possible incrimination to testify for Earl. That situation would vividly dramatize an argument on behalf of Earl that the statute *as applied* denied him due process. [*Id.* 124 U.S.App.D.C. at 80, 361 F.2d at 534 n.1 (emphasis in original).]

In a statement upon denial of a petition for rehearing *en banc* in the same case, Judge Leventhal also expressed a concern that the principles underlying *Brady* should be applied to immunity questions. *Earl v. United States,* 124 U.S.App.D.C. 77, 364 F.2d 666 (1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). Chief Judge Bazelon of the same court has suggested that the trial court may be able to condition the introduction of government evidence on the Government's agreement to grant immunity to defense witnesses. *United States v. Leonard,* 161 U.S.App.D.C. 36, 66, 494 F.2d 955, 985 n.79 (1974) (Bazelon, C. J., concurring in part and dissenting in part). *See also United States v. Gaither,* 176 U.S. App.D.C. 274, 539 F.2d 753, *cert. denied,* 429 U.S. 961, 97 S.Ct. 388, 50 L.Ed.2d 329 (1976) (statement of Bazelon, C. J., upon denial of petition for rehearing *en banc*). The Seventh Circuit in *United States v. Allstate Mortgage Corp.,* 507 F.2d 492 (7th Cir. 1974), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975), held that a defendant has no constitutional right to have immunity conferred upon witnesses who exercise their fifth amendment privilege; yet it expressly contrasted the case with a situation in which the Government secures evidence by means of grants of immunity. In *United States v. Alessio,* 528 F.2d 1079 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976), the court refused to compel the Government to grant immunity to defense witnesses. The court noted that the "key question" was whether the defendant "was denied a fair trial because of the government's refusal to seek immunity for defense witnesses," but it concluded that the defendant was not denied a fair trial because the proffered evidence was merely cumulative. *Id.* at 1082.

In the present case, the Government refused to grant immunity to Chappel and Sargis, thereby placing their testimony out of Saettele's reach. These were the only witnesses who might have rebutted McGirr's testimony and corroborated Saettele's own story. The Government presented no affirmative reason for refusing immunity to these two witnesses.[5] In fact, the prosecutor had already offered immunity to Chappel but withdrew the offer when it appeared that Chappel's testimony would support Saettele's defense. Thus, the Government utilized its immunity-granting power to obtain McGirr's crucial testimony and to make its case against Saettele, but it denied Saettele the benefit of that power and, as a result, the opportunity to obtain offsetting testimony. The principles enunciated in *Roviaro* and *Brady, supra,* should be extended to the particular circumstances present in this case, for the prosecution's conduct amounted to the withholding of evidence favorable to Saettele and served to deprive him of a fair trial.

---

**5.** One possible reason is that the Government would sacrifice the opportunity to prosecute Sargis and Chappel. Saettele argues in his brief that the Government had already decided not to do so. Whether this assertion is true or not, the Government would lose little by granting use immunity. As one commentator has noted:

> *Kastigar's* analysis applies with equal force to the grant of use immunity to defense witnesses. *The prosecution surrenders nothing by granting it: The incriminating statements that it cannot use against the immunized witness are statements that, absent immuni-*

*ty, would never have been made.* The prosecution can hardly complain about immunizing defense witnesses because, as the Supreme Court said, the prosecution is in *substantially the same position* with respect to a witness after granting him immunity as before. [Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71, 169 (1974) (emphasis added).]

Here, Sargis and Chappel apparently told their story at least in part prior to trial but had made no incriminating statements under oath. The Government could, of course, use information obtained prior to the grant of immunity.

As noted above, the power to seek a grant of immunity under federal law rests with the United States attorney, not the trial court. The trial court, however, possesses an inherent power to regulate the introduction of evidence and to assure the integrity and fairness of the judicial process. Under the narrow circumstances disclosed in this record, the trial court possessed the power to condition its consideration of McGirr's testimony upon the granting of immunity to Sargis and Chappel.

Accordingly, I would vacate the judgment of conviction and remand for further proceedings.[6]

**6.** The case need not be retried in its entirety on the theory of this dissent. The district court could allow Saettele to reopen his defense and should allow the Government an opportunity to grant immunity to Sargis and Chappel. If the Government chooses not to do so, the district court could grant Saettele's motion to strike McGirr's testimony or his motion to dismiss the prosecution.