UNITED STATES of America, Appellee,

v.

**John V. CAPOZZI, Appellant.**

**No. 88–1567.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1988.

Decided Aug. 21, 1989.

Rehearing and Rehearing En Banc Denied Oct. 6, 1989.

---

609

Nearl R. Sonnett, Miami, Fla., for appellant.

Rosemary C. Meyers, St. Louis, Mo., for appellee.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and ROSENBAUM,* District Judge.

* The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota, sitting by designation.

ROSENBAUM, District Judge.

John V. Capozzi (Capozzi) appeals his conviction, after trial by jury, on charges of conspiracy, fraud, and insider dealing.[1] The charges arise out of his scheme to defraud the United States and Bohemian Savings and Loan Association (Bohemian), an ailing St. Louis, Missouri, financial institution. On appeal, Capozzi raises several alleged errors at trial, including the district court's[2] 1) failure to grant judicial immunity to defense witnesses, 2) limitation of bias or motive evidence, 3) failure to dismiss the conspiracy and fraud charges, and 4) failure to require a courtroom identification of appellant. For the reasons set forth below, we find no reversible error and affirm the judgment of conviction in all respects.

## I. BACKGROUND

"Because the jury found appellant guilty on all counts, we recount the evidence presented at trial in the light most favorable to the prosecution." *United States v. Padilla,* 869 F.2d 372, 375 (8th Cir.1989). In October, 1982, Capozzi, a Florida real estate developer, secured a $945,000 construction loan from Bohemian for the completion of Cedar Villas, a large south Florida development. While negotiating that loan, Capozzi expressed to Dan Wood (Wood), Bohemian's president, his desire to purchase a bank. Capozzi and Wood discussed whether he, Capozzi, would be interested in joining a group which was attempting to acquire Bohemian.[3] Capozzi was

interested, and in November, 1982, he met with a group headed by Al Keller (Keller). Shortly thereafter, Keller submitted a formal offer to the Federal Savings and Loan Insurance Corporation (FSLIC) listing himself, Capozzi, and Jerome Nagelbush (Nagelbush), a Capozzi associate, as purchasers. In late 1982, however, the FSLIC rejected Keller's proposal.

Capozzi immediately commenced discussions with Wood and Nagelbush concerning an alternate plan for acquiring Bohemian. Ultimately, Nagelbush opted out, but in January, 1983, Capozzi submitted to the FSLIC his own purchase plan, using a combination of real estate and second mortgages as his primary investment vehicles. Capozzi's acquisition plan 1) guaranteed that the net worth of the institution would be maintained at a predetermined level, 2) required the FSLIC to contribute $2.5 million to Bohemian outright, in addition to a $5.7 million subordinated debenture, to be repaid beginning five years after acquisition, and 3) called for Wood to remain as president of Bohemian. After much discussion, the FSLIC accepted Capozzi's proposal, and on December 1, 1983, the sale closed, making Capozzi the sole shareholder and chairman of the board of directors for Bohemian.

Immediately before taking control of Bohemian, and soon thereafter, Capozzi caused the institution to enter into transactions which ran afoul of banking laws. This resulted in, first, his removal from the bank and, ultimately, the present fifteen

---

1. On June 24, 1987, Capozzi was charged by indictment with one count of conspiracy to defraud a savings and loan institution in violation of 18 U.S.C. § 371, seven counts of wire fraud in violation of 18 U.S.C. § 1343, five counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of unlawfully receiving bank funds from insider transactions in violation of 18 U.S.C. § 1006. On February 17, 1988, the jury found him guilty of these charges.

Capozzi appeared for sentencing on April 1, 1988, at which time he was adjudged guilty, and ordered to serve an aggregate of eight years imprisonment, and to pay, as restitution, the sum of $2.47 million to the Federal Savings and Loan Insurance Corporation within five years of his release from confinement.

2. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

3. Bohemian was a state chartered savings and loan institution insured by the Federal Savings and Loan Insurance Corporation and subject to the jurisdiction of the Federal Home Loan Bank Board. Bohemian had been losing money for years and in 1981 was insolvent, losing $6 million per year. The federal regulators were, of course, interested in Bohemian's financial health and determined that its financial problems stemmed from incompetent management. The agencies, therefore, began to look for someone—a financial savior who could bring competent management to Bohemian—to either merge with or acquire the institution.

count federal indictment charging him with conspiracy, fraud, and insider dealing.

During a two week trial,[4] the government's evidence established that Capozzi orchestrated transactions which profited him or his associates at the expense of Bohemian in violation of federal banking laws. The jury considered evidence concerning three principal transactions.

### A. The Cedar Ridge Escrow

In October, 1983, Bohemian, at Capozzi's direction, disbursed $140,000 to Capozzi associate Jerome Nagelbush, supposedly as a real estate escrow deposit on a property known as Cedar Ridge. Bohemian never purchased Cedar Ridge, however, and the $140,000 was never returned to the bank. When Bohemian's chief financial officer, Gary Schlette, requested documentation concerning the purported escrow payment for bank examiners, Wood, after consulting with Capozzi, described the payment as merely an interest free loan.

### B. The Emerald Hills Transaction

In early 1984, Bohemian, under Capozzi's direction, purchased Emerald Hills Country Club (Emerald Hills), a one thousand unit apartment, golf course, and country club complex located in Hollywood, Florida, for the sum of $10 million. Under the guise of a sales commission, Capozzi directed the additional payment of $200,000 by Bohemian to Brinwo Development Corporation (Brinwo), a company owned by Capozzi associate James Inklebarger (Inklebarger). Neither Brinwo nor Inklebarger, however, played any role in the Emerald Hills transaction. Moreover, Inklebarger immediately transferred $198,000 back to Capozzi. Capozzi used $123,000 of that money to make the first quarterly payment required under the terms of his purchase of Bohemian.

### C. The Camelot Transaction

In 1983, prior to acquiring Bohemian, Capozzi, through his corporation, Camelot at University Park, Inc. (Camelot), purchased a piece of undeveloped land in Miramar, Florida, for approximately $510,000. In early 1984, shortly after acquiring Bohemian, Capozzi, without disclosing his ownership of Camelot, directed Bohemian to contract to purchase the undeveloped Camelot property for the sum of $2.66 million. Capozzi's scheme depended on a fraudulent appraisal. Capozzi instructed his appraiser, Marvin Meacham, to value the undeveloped land as if it were a developed property. In sum, Capozzi presented Bohemian an appraisal based on development work which had not been performed. Capozzi used a portion of the proceeds he received from that transaction to make the second and third quarterly payments for Bohemian.

## II. ISSUES ON APPEAL

Capozzi raises the following questions: 1) whether the district court properly refused appellant's request to judicially immunize three potential defense witnesses; 2) whether the district court properly limited bias or motive evidence, pursuant to Rule 608(b) of the Federal Rules of Evidence; 3) whether the district court properly denied appellant's motion to dismiss the conspiracy and fraud counts in light of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); and 4) whether a courtroom identification of Capozzi was essential in this case.

## III. DISCUSSION

### A. Defense Witness Immunity

Four days before trial, the government filed a bill of particulars naming five unindicted co-conspirators. Three such named individuals were Capozzi associates Nagelbush, Inklebarger, and Jacob Fishman (Fishman).[5] During the trial, after the

---

4. After three successive trial settings, the trial began on February 1, 1988, and concluded on February 17, 1988.

5. Fishman, a Capozzi lawyer, was intimately involved in the Camelot transaction and in con-

cealing Capozzi's ownership interest in the Camelot property.

government had concluded its case, the defense called the three individuals to the witness stand out of the presence of the jury. Each man asserted that, if called, he would invoke his fifth amendment privilege and decline to testify. The district court determined that each of the individuals had asserted his right to remain silent and, therefore, concluded it would be improper for the court to call these witnesses before the jury and compel them to claim their constitutional privilege. Accordingly, these potential defense witnesses were excused from testifying.

Capozzi's trial counsel advised the district court that the anticipated testimony of these individuals was crucial to Capozzi's defense. The government declined to apply for use immunity pursuant to 18 U.S.C. § 6001, *et seq.*, and the district court took the position it had no authority to compel the government to offer statutory immunity. Capozzi then requested that the district court a) continue the matter,[6] b) dismiss the indictment with prejudice, or c) judicially immunize the witnesses and compel their testimony.

■ Capozzi did not seek an order from the district court compelling the government to immunize these witnesses.[7] Instead, he invited the district court to fash-

ion an extraordinary remedy: judicial immunity, "the power of a court, unaided by statute, to order that a witness' testimony cannot be used against him." *United States v. Turkish*, 623 F.2d 769, 773 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). The district court declined Capozzi's invitation, instead, granting him leave to present to the jury relevant portions of earlier sworn deposition testimony offered by all three men during civil proceedings before attorneys for the Federal Home Loan Bank Board and FSLIC in connection with Capozzi's actions at Bohemian.

■ On appeal, Capozzi claims 1) his defense depended on the testimony of these individuals; 2) the government knew this and, for seven months, lulled him into relying on the anticipated testimony of these witnesses; 3) the timing of the government's bill was designed to intimidate and discourage Nagelbush, Inklebarger, and Fishman from testifying; and d) the government's denial of statutory immunity to these individuals forced them to assert their fifth amendment privilege thereby withholding exculpatory testimony which would otherwise have been available to him.[8]

---

6. Capozzi does not appeal the district court's denial of his requested continuance.

7. It is settled law that a court is without authority to immunize a witness pursuant to the federal use immunity statute, 18 U.S.C. §§ 6001, *et seq. Pillsbury Co. v. Conboy*, 459 U.S. 248, 261, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983). In *Pillsbury Co. v. Conboy*, the Supreme Court, while construing the federal immunity statute, declared, in dicta, "[n]o court has authority to immunize a witness." *Id.* The authority to immunize a witness, "is peculiarly an executive one, and only the Attorney General or a designated officer of the Department of Justice has authority to grant statutory use immunity." *Id.; see also United States v. Doddington*, 822 F.2d 818, 821 (8th Cir.1987) (the procedure for granting use immunity with respect to potentially incriminating testimony is provided in 18 U.S.C. §§ 6002 and 6003). Nor can a district court compel the government prosecutor to apply for statutory immunity. *United States v. Eagle Hawk*, 815 F.2d 1213, 1217 (8th Cir.1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 712, 98 L.Ed.2d 662 (1988); *see also United States v. Graham*,

548 F.2d 1302, 1315 (8th Cir.1977). Thus, the district court had no authority, as Judge Hungate correctly recognized, to order the prosecutor to grant statutory use immunity to these potential defense witnesses.

8. Neither Nagelbush nor Inklebarger were asked by Capozzi's trial counsel to state their reasons for asserting their right to remain silent, and they gave none. Fishman, however, stated that he decided not to testify after learning of the bill of particulars and discussing his situation with his lawyer.

At no point in the trial did Capozzi's counsel request the district court to make further inquiry as to the validity of the fifth amendment claim of these individuals.

Capozzi argues for the first time on appeal that the district court did not adequately conduct a hearing concerning the validity of the fifth amendment privileges invoked by these potential defense witnesses. In the absence of a trial objection, we review that issue under the plain error standard. We find no plain error in the district court's decision to excuse these witnesses from testifying.

In sum, Capozzi argues that government misconduct—the alleged purposeful eleventh hour notification that these individuals were unindicted co-conspirators coupled with the prosecutor's refusal to offer statutory immunity—prevented him from presenting exculpatory evidence guaranteed by the sixth amendment's Compulsory Process Clause and denied him his right to due process protected by the fifth amendment.

Traditionally, defendants have used two theories in presenting due process arguments for immunization of defense witnesses. The first suggests setting the conviction aside to permit the balanced immunization of witnesses; the second would authorize judicial immunity.

Considering the first possibility, some Courts of Appeals have suggested or held that if the government grants use immunity to its witnesses but refuses to offer immunity to potential defense witnesses, with the deliberate intention of distorting the judicial fact finding process, a defendant's right to due process may have been violated.[9] *United States v. Pennell,* 737 F.2d 521, 526 (6th Cir.), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *see United States v. Franz,* 697 F.2d 188, 191 (7th Cir.), *cert. denied,* 464 U.S. 828, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983); *Government of the Virgin Islands v. Smith,* 615 F.2d 964, 968–69, 974 (3rd Cir.1980); *United States v. Klauber,* 611 F.2d 512, 517–18 (4th Cir.), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *United States v. Alessio,* 528 F.2d 1079, 1082 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *Earl v. United States,* 361 F.2d 531, 534 n. 1 (D.C.Cir.1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 2121 (1967); *see also United States v. Lord,* 711 F.2d 887, 891 (9th Cir.1983).

The recommended remedy in such cases, however, has not been a grant of judicial immunity to defense witnesses. Rather, a court should set aside the conviction and remand the case, in order to afford the government an opportunity to immunize both government and defense witnesses pursuant to 18 U.S.C. §§ 6002 and 6003. *Pennell,* 737 F.2d at 526; *see Lord,* 711 F.2d at 891–92; *Smith,* 615 F.2d at 969 (when a court finds prosecutorial overreaching with the deliberate intent to disrupt the fact finding process, it should order the government to grant statutory immunity to defense witnesses or face a judgment of acquittal); *see also Klauber,* 611 F.2d at 518.

The second theory posits that a court has inherent power to immunize witnesses whose exculpatory testimony is essential to an effective defense. This thesis, that a court can judicially immunize a defense witness so that exculpatory evidence may be presented, has only been accepted in the Third Circuit. *Government of the Virgin Islands v. Smith,* 615 F.2d 964 (3rd Cir. 1980). In *Smith,* the court of appeals announced a rule which requires a court to immunize a potential defense witness when it is found that the witness can offer testimony which is clearly exculpatory and essential to the defense case, and when the government has no strong interest in withholding statutory use immunity. *Smith,* 615 F.2d at 974. Under *Smith,* a court's power to immunize witnesses is said to exist independently of the prosecutor's authority to grant statutory use immunity. The need for judicial use immunity is triggered neither by prosecutorial misconduct nor intentional distortion of the trial process, but by the fact that the defendant is prevented from presenting exculpatory evidence. *Smith,* 615 F.2d at 974.

█ Appellant urges that this Court adopt the *Smith* formulation. Neither the Supreme Court nor this Court have ruled on whether a court has inherent authority to grant use immunity. We have, however,

---

**9.** This is not a case where the government granted use immunity to its witnesses but refused to immunize defense witnesses. The government's chief witness, Dan Wood, another conspirator and the former president of Bohemian, testified pursuant to the terms of a plea agreement. Under the terms of that agreement, Wood plead guilty to one count of wire fraud in exchange for an agreement that this would be the only federal charge asserted, and his promise to provide truthful testimony at Capozzi's trial or any related proceeding.

previously indicated our doubt that such a power lies in the judiciary. *United States v. Hardrich,* 707 F.2d 992, 994 (8th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983); *United States v. Eagle Hawk,* 815 F.2d 1213, 1217 (8th Cir.1987), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 712, 98 L.Ed.2d 662 (1988); *see also United States v. Payton,* 878 F.2d 1089, 1092 (8th Cir.1989). Every court of appeals which has considered the question has rejected the Third Circuit's *Smith* holding as being a violation of the doctrine of separation of powers. *See Mattheson v. King,* 751 F.2d 1432 (5th Cir.1985), *cert. dismissed,* 475 U.S. 1138, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); *Pennell,* 737 F.2d at 527; *United States v. Hunter,* 672 F.2d 815, 818 (10th Cir.1982); *United States v. Thevis,* 665 F.2d 616, 639–40 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *United States v. Turkish,* 623 F.2d 769 (2d Cir.1980); *Earl v. United States,* 361 F.2d 531, 534 (D.C. Cir.1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). We decline to follow *Smith* and reassert our doubt that the Court has the power to order such a grant of judicial immunity.

Even assuming a district court has authority to immunize defense witnesses, unaided by 18 U.S.C. §§ 6002 and 6003, it is clear that such an order is an extraordinary remedy, to be used sparingly, and then only where the proffered evidence is *"clearly exculpatory."*[10] *Eagle Hawk,* 815 F.2d at 1217; *Hardrich,* 707 F.2d at 994.

■ The case before us does not warrant such extraordinary relief. Appellant suggests that prosecutorial misconduct prevented him from presenting a defense, thus violating his right to due process. Obviously, a prosecutor may not prevent a defense witness from testifying. *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). To establish a denial of due process, however, the government's acts must be of such a quality as necessarily prevents a fair trial. *United States v. Rubin,* 836 F.2d 1096, 1101 (8th Cir.1988) (*citing Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), and *United States v. Valenzuela–Bernal,* 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982)).

■ Appellant suggests that the timing of the government's notification of unindicted co-conspirators was designed and intended to intimidate and discourage appellant's witnesses thereby interfering with the fact finding process. This suggestion is without merit. The seven month period from indictment to trial was more than an adequate time to prepare a defense. Moreover, the role of Nagelbush, Inklebarger, and Fishman in these transactions was known to all from the time the indictment was returned. Finally, there has been no showing by appellant of prosecutorial misconduct in making its immunity decisions. We find no absence of fairness here.

■ Furthermore, we find no violation of appellant's sixth amendment right to compulsory process.[11] To establish such a violation, there must be a showing of an absence of material testimony favorable to petitioner's defense. *United States v. Rubin,* 836 F.2d 1096, 1101 (8th Cir.1988) (*citing Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. at 3447); *see also United States v. Holtzen,* 718 F.2d 876, 878 (8th Cir.1983) (per curiam). The district court

---

**10.** *See Smith,* 615 F.2d at 968, 971–72 (the court of appeals, recognizing the potential interference with the prerogatives of the executive branch, conditioned conferral of judicial immunity on a defendant's making a convincing showing that: a) defendant properly sought immunity in the district court, b) the witness was available to testify but for his assertion of privilege, c) the proffered testimony was clearly exculpatory, d) the testimony was essential to the defendant's defense, and e) there was no strong government interest against immunity).

**11.** [T]he ... Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness' non-privileged testimony heard, but does [not] ... carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination.

*Turkish,* 623 F.2d at 774; *see also United States v. Saettele,* 585 F.2d 307, 311 (8th Cir.1978) (Bright, J., dissenting), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979).

permitted Capozzi's trial counsel to present as evidence relevant portions of earlier sworn deposition testimony given by Nagelbush, Inklebarger, and Fishman. These statements were given at civil proceedings related to the fall of Bohemian. The district court permitted Capozzi's trial counsel to present to the jury as much of this material as he deemed necessary to his defense. On appeal, Capozzi fails to delineate any suggested testimony over and above that which was presented to the jury. In our view, Capozzi was permitted to present his version of the facts to the jury. There was no violation of appellant's right to compulsory process.

In light of appellant's failure to show that prosecutorial misconduct or overreaching prevented him from presenting his version of the facts to the jury, we find his due process assertion to be chimerical. Consequently, we need not resolve, here, the ultimate question of whether a court has inherent authority to fashion such extraordinary relief as judicial immunity of potential defense witnesses. On these facts, we conclude the district court properly refused to grant judicial use immunity to Nagelbush, Inklebarger, and Fishman.

### B. Exclusion of Martin's Testimony

While attempting to impeach government witness Gary Schlette, Bohemian's chief financial officer under Capozzi, defense counsel asked a series of questions concerning specific instances of conduct which took place prior to Capozzi's acquisition of Bohemian. Capozzi's counsel inquired of a) Schlette's employment contract with Bohemian; b) his actions, on Bohemian's behalf, to acquire Gravois Home Savings and Loan (Gravois); c) his participation in a group, which was attempting to purchase Gravois during the same time period as Bohemian; d) his desire to be president of Gravois; and e) information he purportedly placed on an application for a $1.5 million universal life insurance policy from Richard Martin, a member of the group with whom Schlette attempted to purchase Gravois. The record shows Schlette answered all such questions.

Later in the trial, the defense attempted to introduce evidence, in the form of testimony by Richard Martin, concerning the same instances of conduct. The government objected to such testimony arguing it would be extrinsic evidence of a witness' character. Capozzi's counsel asserted Martin's testimony was being offered to prove Schlette's motivation to testify for the government, to show bias against Capozzi, and to establish Schlette's motive for testifying for the prosecution against Capozzi. The district court refused to admit the offered testimony, pursuant to Rule 608(b) [12] of the Federal Rules of Evidence (Fed.R. Evid.). Capozzi challenges this ruling on appeal.

■ " 'To the extent that it is ever admissible, extrinsic evidence to attack credibility is usually subject to the discretion of the trial judge.' " *United States v. Corbin,* 734 F.2d 643, 655 (11th Cir.1984) (*quoting United States v. Dinitz,* 538 F.2d 1214, 1224 (5th Cir.1976)). Generally, "a party's right to impugn the character for truthfulness of an opposing party's witness is limited to questioning the witness on cross-examination. When such cross-examination testimony goes into evidence 'the examiner must take his answer, and the examiner cannot offer impeachment testimony.' " *Corbin,* 734 F.2d at 655 (*quoting United States v. Cohen,* 631 F.2d 1223, 1226 (5th Cir.1980)). An exception to this general rule, however, has to do with offered testimony of bias. Facts showing bias are not collateral, and an examiner, of course, is

---

**12.** Rule 608(b) provides in relevant part:
(b) Specific instances of conduct.
Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified....
Rule 608(b), Fed.R.Evid.

not bound by the answer. *Johnson v. Brewer*, 521 F.2d 556, 562 n. 13 (8th Cir. 1975); *see also Corbin*, 734 F.2d at 655; *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir.1984).

■ Appellant suggests that Martin's testimony would have shown Schlette's bias against Capozzi and his motive for testifying for the prosecution. Capozzi implies that Schlette testified for the government to avoid potential prosecution or other sanction because of his conduct at Bohemian. The record, however, reveals no evidence of any arrangement or deal between the government and Schlette. Absent evidence, showing Schlette had a reason to proffer biased testimony against Capozzi, the district court applied Rule 608(b).

"Reversal is warranted only where an abuse of discretion leads to prejudice." *United States v. Lynch*, 800 F.2d 765, 770 (8th Cir.1986), *cert. denied*, 481 U.S. 1022, 107 S.Ct. 1907, 95 L.Ed.2d 513 (1987) (*citing United States v. Peyro*, 786 F.2d 826, 828 (8th Cir.1986)). In light of the broad discretion afforded the trial court in regulating cross-examination, we find no abuse here.

C. *McNally* and the Fraud Convictions

■ The indictment charged Capozzi with twelve counts of mail and wire fraud. Because the fraud counts included a paragraph alleging that Capozzi violated his fiduciary duty to Bohemian,[13] appellant asserts those convictions, as well as the conspiracy conviction, must be reversed,[14] pursuant to *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Capozzi contends that throughout the trial the government focused on his alleged breach of a fiduciary duty owed to Bohemian, thereby convicting him of mail and wire fraud based solely on his having participated in a scheme, the sole purpose of which was to deprive Bohemian of its intangible right to the honest and faithful services of its owner and chairman of the board of directors. We are unpersuaded by appellant's contention. *McNally* is simply inapposite.[15]

■ The jury found that Bohemian suffered very tangible money losses to the gain of Capozzi or his associates. The evidence showed that in the Camelot transaction Capozzi purchased the undeveloped property for $510,000 and sold it to Bohemian for $2.66 million, with no disclosure of his own interest, and with a large amount of that money going into Capozzi's pocket. In the Emerald Hills deal, Capozzi directed a payment of $200,000 of which $198,000 was conveyed back to Capozzi. Finally, Capozzi used his position to direct a $140,000 payment from Bohemian to Nagelbush under the guise of an escrow deposit. Clearly, the money from these various transactions was a loss to the institution. The indictment's mere use of the

13. Paragraph 23 of Counts 2 through 8 (which is incorporated into Counts 9 through 13) provides:

> 23. It was further part of said scheme and artifice that John V. Capozzi would and did breach the fiduciary duty to Bohemian, its depositors, and its Board of Directors he as Chairman of the Board of Bohemian owed in that the actions described in paragraph 1–22, above, were not in the best interests of such persons and entities, but rather furthered the interest of John V. Capozzi at the expense of such persons and entities.

14. Capozzi presented this issue in the form of a pretrial motion to dismiss and as a basis for judgment of acquittal, thus preserving this issue for appeal.

15. In *McNally*, the Supreme Court concluded 1) the mail fraud statute, 18 U.S.C. § 1341, was not intended to protect against schemes to defraud citizens of their intangible rights, and 2) Section 1341 is limited in scope to the protection of property rights. 483 U.S. at 355, 360, 107 S.Ct. at 2879, 2881. That does not mean, however, that *McNally* eliminated Section 1341 prosecutions involving intangible rights where a property loss is proven. *See Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 321–22, 98 L.Ed.2d 275 (1987). *McNally* requires a jury charge and proof that the victim was defrauded of money or property. 483 U.S. at 361, 107 S.Ct. at 2882.

The *McNally* decision turned on the fact that there was no such jury instruction and the jury was not required to find that the victim was defrauded of any money or property. *Id.* The Supreme Court, therefore, concluded the jury could have convicted the defendant for conduct not within the reach of Section 1341. *Id.* Such is not the case here.

word "fiduciary" does not mean that *McNally* renders it void.

The jury was properly instructed [16] that financial loss to Bohemian and gain to the defendant are essential to a conviction for fraud. The jury, thus, was instructed that it must find a deprivation of tangible property. We find the requirements of *McNally* have been fully satisfied. Accordingly, we find no reversible error in the district court's decision to deny Capozzi's motions to dismiss or for judgment of acquittal.

### D. Courtroom Identification

At the close of the government's case, defense counsel moved for judgment of acquittal, citing as grounds, *inter alia*, that no witness had made a courtroom identification of Capozzi. The motion was denied.

■ Capozzi contends he was not identified at trial, leaving a reasonable doubt that he was the person accused in the indictment. Capozzi's final contention for reversal of his convictions is meritless. " 'Courtroom identification is not necessary when the evidence is sufficient to permit the inference that the defendant on trial is the person who [committed the acts charged].' " *United States v. Hoelscher*, 764 F.2d 491, 496 (8th Cir.1985) (*quoting United States v. Fern*, 696 F.2d 1269, 1276 (11th Cir.1983)). The jury found the evidence adduced at trial to be sufficient for that purpose, and we agree.

### IV. CONCLUSION

After careful review of each of appellant's contentions, the judgment of the district court is affirmed in all respects.

---

**16.** Jury instruction number 23 defined the words scheme or artifice to include "any plan or course of action intended to deceive others, and to obtain by false and fraudulent pretenses, representations, or promises, money or property from persons so deceived."