George E. CARTER, Appellant,

v.

UNITED STATES, Appellee.

No. 88–CF–532.

District of Columbia Court of Appeals.

Argued En Banc June 20, 1995.

Decided Oct. 24, 1996.

332

John T. Moran, appointed by the court, for appellant.

David A. Reiser, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, as amicus curiae.

Elizabeth Trosman, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R.

Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before WAGNER, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, KING, and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

## ON REHEARING EN BANC

GALLAGHER, Senior Judge:

George E. Carter, appellant, was convicted on two counts of armed robbery, D.C.Code §§ 22–2901, –3202 (1989), and one count of carrying a pistol without a license, D.C.Code § 22–3204 (1989). His principal contention is that the trial judge committed reversible error by sustaining the invocation by his younger brother, Craig Carter, of the constitutional privilege against self-incrimination. On appeal, a division of this court ordered the case remanded for further proceedings in relation to the claim of the constitutional privilege in order to determine "whether there was a reasonable possibility at the time of trial that Craig Carter would be prosecuted," *Carter v. United States*, 643 A.2d 348, 357–58 (D.C.1994), and if not, then the conviction would be set aside. However, we granted the government's petition for rehearing en banc, 651 A.2d 1393, to consider the constitutional issue and vacated the division opinion and judgment. We now remand for further proceedings, and in doing so, we reject our prior holding in *Jaggers v. United States*, 482 A.2d 786 (D.C.1984) (per curiam), and its progeny on the constitutional issue there involved.

## I.

The two complainants testified that George Carter and another man robbed them at gunpoint. Both complainants were previously acquainted with defendant George Carter. Carter called his brother, Craig Carter, as a defense witness at his trial. He proffered that, were it not for a self-incrimination claim he would make, his brother would testify, among other things, that complainant Edmonds had acknowledged to him that he (Edmonds) did not know who had robbed him. His brother Craig was also expected to testify that complainant Edmonds had sold him drugs and had been using drugs at the time of the robbery. The prosecutor advised the court that if the brother, Craig Carter, testified, he would seek to cross-examine him by inquiring about Craig's own drug use, arguing that such drug use was relevant to his ability to perceive and relate his alleged encounter with Edmonds. The trial judge concluded that such cross-examination would be permissible to some extent. The court therefore appointed counsel to advise Craig Carter, who was incarcerated at the time, with respect to his self-incrimination rights under the Fifth Amendment.

Craig Carter was then questioned outside the presence of the jury and, upon the advice of his attorney, stated that he would invoke his privilege against self-incrimination with respect to any questions that might be posed to him with regard to his use of unlawful drugs. His counsel argued that his client's answers to such questions could subject him to prosecution for unlawful possession of a controlled substance.

Appellant proffered at trial that his brother, Craig Carter, had been a resident of a halfway house both in May 1986 (when complainant Edmonds allegedly sold him heroin) and in July 1986 (when Edmonds allegedly admitted not knowing who robbed him), that test samples of Craig's urine had been "dirty" in May, June and July 1986, that Craig's work release privileges had been revoked and "that is why he is where he is." Appellant argued, however, that it would be "utterly unreasonable" to assume that Craig Carter would be prosecuted on the basis of historical evidence for simple possession of PCP a year and a half before the trial, or that "the parole board will punish him twice."

In response to the question, the prosecutor asserted that "we will not immunize [Craig Carter] in advance ... without [eliciting] from the witness all the facts underlying the witness' alleged criminal activity." In any event, the government later declined to grant immunity to the witness, as requested.

After extensive inquiry concerning the government's position on the Fifth and Sixth Amendment issues, the trial judge observed that "the prospect of prosecution in this case

is real albeit not substantial...." In upholding the claim, the court stated that the "legal possibility" of prosecution was the decisive factor in upholding the constitutional claim of privilege against self-incrimination.

Appellant was convicted of all charges. In its discussion of the Fifth Amendment issue on appeal, the divided court's majority opinion summarized the required inquiry in our then controlling opinion in *Jaggers, supra,* as follows:

> [T]he court in *Jackson* specifically noted that, under *Jaggers,* the judge must determine whether "(1) the witness' testimony would be incriminating," and (2) *"if so, whether* the risk of prosecution is substantial and real and not merely fanciful." *Id.* at 196 n. 8 (emphasis added; internal quotation marks omitted). The court added that the trial judge had sufficiently "considered the incriminatory nature of the proposed testimony *and also the likelihood that criminal prosecution would result." Id.*

(Emphasis added).

\* \* \* \* \* \*

In *Jaggers,* we stated that "[o]ne of the questions we must address to resolve the issues presented in this case is whether an absolute legal barrier to prosecution must exist before a witness can be compelled to testify in face of his claim of privilege. We think not." 482 A.2d at 793. In *Wilson* [*v. United States,* 558 A.2d 1135 (D.C.1989)], we reiterated that

> [w]here a witness might legally be prosecuted, but the threat of prosecution is not "real or appreciable," this court has held that the privilege may not properly be invoked.

[*Id.*] at 1141 (citing *In re Neal,* 475 A.2d 390, 392 (D.C.1984) (per curiam)). Similarly, in *Irby* [*v. United States,* 585 A.2d 759 (D.C.1991)], we held that the trial judge must seek a commitment from the prosecutor that the potential defense witness will not be prosecuted, but that even if no commitment is forthcoming, "the trial judge must make an independent assessment, based on all of the circumstances, of the likelihood of prosecution." *Id.,* 585

A.2d at 763–64. In *Irby,* the trial judge made no inquiry regarding the second step, and we therefore remanded for further proceedings. *Id.* at 764.

*Neal, Jaggers, Jackson, Wilson, Irby,* and *(James) Harris* [*v. United States,* 614 A.2d 1277 (D.C.1992)] thus all address not only the authority of the government to prosecute the witness but also the existence *vel non* of a reasonable possibility that this will come to pass. Since the trial judge ultimately held that the first step alone was sufficient, we must return the case to him to determine, many years after the fact, whether there was a reasonable possibility at the time of trial that Craig Carter would be prosecuted, or to put it another way, whether the possibility of prosecution was "real" or merely "fanciful." This determination must be made on the basis of all of the circumstances, including the fact that possession of PCP is itself a crime (and not simply a fact in a chain that might lead to the discovery of a crime), that Craig's use of PCP had been known to correctional authorities for a year and a half, that his halfway house privileges had been revoked, and that, according to Mr. Strasser, misdemeanor prosecutions for unlawful drug possession, based on historical evidence, are most unusual. We are satisfied that if the judge concludes that Craig Carter's claim of privilege was improperly sustained, the error was prejudicial, rather than harmless beyond a reasonable doubt. In that event, the judge must set aside George Carter's convictions.

*Carter, supra,* 643 A.2d at 357–58 (emphasis in original; footnotes omitted).

We granted the government's petition for rehearing en banc and after en banc consideration, we now overrule our prior decision in *Jaggers, supra,* and its progeny, insofar as these cases require the trial judge, in evaluating a defense witness' invocation of the privilege against self-incrimination, to predict or assess the practical likelihood that the witness will be prosecuted.

## II.

There has long been a tension between the accused's Sixth Amendment right of compul-

sory process to obtain witnesses in aid of a defense, and a witness' Fifth Amendment right against self-incrimination. We went en banc here to decide the important constitutional issue of what should happen when these Sixth Amendment rights of a defendant collide with the Fifth Amendment right of a trial witness against self-incrimination, in the manner involved in this case. We further consider the important interplay of the defendant's Fifth Amendment due process rights to a fair, truth-seeking trial in relation to the claim on self-incrimination.

This court has addressed a conflict between the Fifth and Sixth Amendment constitutional rights on several occasions. In *In re Neal, supra,* the witness was held in criminal contempt for failing to testify before a grand jury on the identity of the driver of a car in a robbery in which he was involved. The witness had been sentenced pursuant to a plea bargain and asserted that he could not later be ordered to testify because he remained liable to prosecution by the District of Columbia despite having reached a plea bargain with the United States Attorney. We deemed

> the threat of prosecution by the Corporation Counsel as not "real and appreciable." ... Moreover, we deem it only an "imaginary possibility" that the Corporation Counsel might proceed against appellant for violations of Police Regulations upon the basis of his answering grand jury questions about the driver of the car on the night of the robbery after appellant had been convicted and sentenced on the armed robbery charge brought by the United States Attorney.

475 A.2d at 392 (quoting *Alston v. United States,* 383 A.2d 307, 312 (D.C.1978)); *see also Harris, supra,* 614 A.2d at 1282 (concluding that "there was no real danger of legal detriment arising out of the second disclosure"). In *Jaggers, supra,* 482 A.2d at 793, this court concluded no "absolute legal barrier to prosecution must exist before a witness can be compelled to testify in face of his claim of privilege." Rather, we held the trial judge must evaluate the actual risk of prosecution, not just whether the testimony would be incriminatory. *Id.*

Since *Jaggers,* this court has repeatedly said that, when considering a conflict between the Fifth Amendment right against self-incrimination and the Sixth Amendment right to present a potential exculpatory witness, the trial court should analyze the likelihood of criminal prosecution. In *Jackson v. United States,* 490 A.2d 192, 196 n. 8 (D.C. 1985), the court stated, relying on *Jaggers,* that a judge must determine whether "(1) the witness' testimony would be incriminatory, and (2) if so, whether the risk of prosecution is substantial and real and not merely fanciful" (internal quotation marks omitted). The court added that the trial judge had sufficiently "considered the incriminatory nature of the proposed testimony and also the likelihood that criminal prosecution would result." *Id.*

In *Irby, supra,* the court again stated that the "Fifth Amendment privilege only extends to real dangers and not to remote possibilities where the threat of prosecution is not real or appreciable." 585 A.2d at 763 (internal quotation marks omitted). We concluded that even when the prosecutor cannot "make a commitment" that a potential defense witness will not be prosecuted, "the trial judge must make an independent assessment, based on all of the circumstances, of the likelihood of prosecution." *Id.* at 763–64. It is the task of the trial judge to assess the "probability of prosecution." *Id.* at 764. In *Wilson, supra,* we reiterated that

> [w]here a witness might legally be prosecuted, but the threat of prosecution is not "real or appreciable," this court has held that the privilege may not properly be invoked.

558 A.2d at 1141 (citing *In re Neal, supra,* 475 A.2d at 392).

*Jaggers, Neal, Jackson, Wilson, Irby,* and *Harris* stand for the proposition that when this issue arises the trial court must evaluate whether, in practical terms, the government is likely to prosecute the witness claiming the privilege against self-incrimination. However, since we are sitting en banc, we are not bound by this court's earlier decisions on the issue involved.

### III.

We now address first the conflict between the Fifth and Sixth Amendments when a defendant seeks to compel potentially exculpatory testimony from a defense witness who invokes a Fifth Amendment privilege against self-incrimination. In doing so, we will canvass numerous opinions across the country—federal and state—where this constitutional issue has been discussed. Since we are interpreting federal constitutional provisions we will naturally focus considerable attention on opinions of the federal appellate courts interpreting these same Bill of Rights provisions.

In *Harris, supra,* 614 A.2d at 1281–82, we summarized the basic legal principles applicable to the issue here presented as follows:

> As the trial judge explicitly recognized, a criminal defendant's right to present witnesses in his own defense is a fundamental one. *Wilson v. United States,* 558 A.2d 1135, 1140 (D.C.1989). Nevertheless, "in the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." *Id.* "Because both rights are so precious ... and because a forced election is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision." *Id.*

So, in considering a claim of privilege against self-incrimination it is not a crucial consideration whether the Fifth Amendment claim by a witness is being made in the face of a defendant's Sixth Amendment right to compel testimony in one's defense. The Fifth Amendment privilege nevertheless prevails, though a collision between the two amendments should be avoided if feasible.

We find ourselves in agreement with the overwhelming majority of cases across the land, especially in the federal circuits, which have determined that the trial judge should not speculate about or predict the likelihood of prosecution in relation to an assertion of the constitutional privilege against self-incrimination. *See, e.g., Resnover v. Pearson,* 965 F.2d 1453, 1462 (7th Cir.1992) ("[w]e cannot agree that a witness' constitutional privilege against self-incrimina-

tion depends upon a judge's prediction of the likelihood of prosecution"), *cert. denied,* 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993); *United States v. Sharp,* 920 F.2d 1167, 1171 (4th Cir.1990) (stating that "once incriminating potential is found to exist, courts should not engage in raw speculation as to whether the government will actually prosecute ... and should only pursue that inquiry when there are real questions concerning the government's ability to do so because of legal constraints such as statutes of limitation, double jeopardy, or immunity"); *United States v. Cuthel,* 903 F.2d 1381, 1384 (11th Cir.1990) (witnesses can properly invoke privilege "even if the risk of prosecution is remote" and

> [w]hile there is arguably a conflict between a witness's fifth amendment privilege and a defendant's sixth amendment right to compulsory process, such conflict long ago was resolved in favor of the witness's right to silence. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)).

*United States v. Edgerton,* 734 F.2d 913, 921 (2d Cir.1984) (stating that the judge should not predict the likelihood of prosecution); *United States v. LaCoste,* 721 F.2d 984, 987 (5th Cir.1983) (privilege upheld even if likelihood of prosecution "remote"), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Jones,* 703 F.2d 473, 477–78 (10th Cir.1983) (holding that a court "should not attempt to speculate whether the witness will in fact be prosecuted" despite an affidavit stating that no criminal prosecution is underway); *In re Corrugated Container Antitrust Litig.,* 213 U.S.App. D.C. 319, 329, 662 F.2d 875, 885 (1981) (privilege upheld even if likelihood of prosecution remote); *In re Corrugated Container Antitrust Litig.,* 661 F.2d 1145, 1151 (7th Cir.1981) (stating that "validity of the privilege cannot be grounded on a district court's prediction of the likelihood of prosecution"), *aff'd,* 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983); *In re Folding Carton Antitrust Litig.,* 609 F.2d 867, 871 (7th Cir.1979) (stating that "we cannot agree that a witness' constitutional privilege against self-incrimination depends upon a judge's prediction of the likelihood of pros-

ecution"); *In re Keijam T.*, 226 Conn. 497, 628 A.2d 562, 566 (1993) (stating that the test is possibility of prosecution rather than likelihood of prosecution); *Commonwealth v. Long*, 533 Pa. 388, 625 A.2d 630, 634 (1993) ("[e]ven though the danger of prosecution for fornication was remote, such a possibility presented a reasonable cause for the defendant to be apprehensive"). "The rarity of prosecutions under a particular statute, or a prosecuting attorney's indication in a particular case that he will not prosecute, are not sufficient to defeat a claim of privilege" against self-incrimination. *Choi v. State*, 316 Md. 529, 560 A.2d 1108, 1112 (1989).

In *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir.1958), the court earlier answered the same question posed to this court in this case: "whether or not a witness can invoke his privilege against self-incrimination where practically there is only a slight possibility of prosecution." The *Miranti* court answered the question:

> We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor.

*Id.* (footnote omitted); *see also In re Corrugated Container Antitrust Litig.*, *supra*, 661 F.2d at 1151 (concluding that "[t]he validity of the privilege cannot be grounded on a district court's prediction of the likelihood of prosecution because the past and present behavior of prosecutorial authority is not a sufficiently accurate indication of the risk of criminal prosecution").

The government's present intent in relation to prosecution of the crime does not affect the Fifth Amendment claim. *United States v. Chase*, 281 F.2d 225, 229–30 (7th Cir.1960). In fact, reliance upon statements by the government that they will not prosecute or are not intending to prosecute will not extinguish the witness' privilege against self-incrimination. *See United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Estate of Fisher v. C.I.R.*, 905 F.2d 645, 649 (2d Cir.1990); *Sharp*, *supra*, 920 F.2d at 1171; *Edgerton*, *supra*, 734 F.2d at 921 n. 10; *United States v. Johnson*, 488 F.2d 1206, 1209 n. 2 (1st Cir.1973); *Choi*, *supra*, 560 A.2d at 1112. Nor will the practical assessment of the reality of prosecution defeat the privilege against self-incrimination. *See In re Master Key Litig.*, 507 F.2d 292, 293 (9th Cir.1974); *Commonwealth v. Francis*, 375 Mass. 211, 375 N.E.2d 1221, 1225 , *cert. denied*, 439 U.S. 872, 99 S.Ct. 205, 58 L.Ed.2d 185 (1978); *Commonwealth v. Colantonio*, 31 Mass.App.Ct. 299, 577 N.E.2d 314, 318 (1991), *review denied*, 414 Mass. 1105, 617 N.E.2d 639 (1993); *In re Knapp*, 536 So.2d 1330 (Miss.1988); *Grant v. State*, 83 Wis.2d 77, 264 N.W.2d 587, 590–91 (1978). "Surely a witness need not be forced to testify on the assumption of prosecutorial sympathy or laxity." *Francis*, *supra*, 375 N.E.2d at 1225.

Thus, a court may only assess the possibility of future prosecution not the probability. *In re Keijam T.*, *supra*, 628 A.2d at 566. "[W]hether, 'as a practical matter,' such a prosecution is 'unlikely' has no bearing." *Colantonio*, *supra*, 577 N.E.2d at 318 (quoting *Francis*, *supra*, 375 N.E.2d at 1221).

As we have seen, these various federal circuits and state courts conclude that only the possibility, not the probability, of prosecution is controlling in determining whether to uphold a witness' privilege against self-incrimination. By this we mean that once the court has determined that the proposed testimony is potentially incriminating, the only evaluation left for the court is one that determines whether there is an absolute bar to subsequent prosecution and not what the likelihood may be. By stopping the trial court's evaluation process with whether the testimony is incriminatory, the trial court is freed from involvement in the executive function and the unjustifiable burden of trying to assess the likelihood of future prosecution.

In *Kastigar v. United States*, the Supreme Court explained:

The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor.

\* \* \* \* \* \*

But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. This Court has been zealous to safeguard the values that underlie the privilege.

406 U.S. 441, 443–45, 92 S.Ct. 1653, 1655–56, 32 L.Ed.2d 212 (1972) (footnotes omitted). As the Supreme Court there stated, a defendant's Sixth Amendment right to the benefit of exculpatory testimony must yield to the witness' constitutional privilege against self-incrimination. *See also United States v. Bowe*, 698 F.2d 560, 565 (2d Cir.1983); *Horne v. State*, 321 Md. 547, 583 A.2d 726, 728 (1991). When there is a conflict between the Sixth Amendment rights of the accused and the Fifth Amendment privilege of the witness, the right to compel testimony must yield to the witness' privilege against self-incrimination. *See, e.g., United States v. Khan*, 728 F.2d 676, 678 (5th Cir.1984) (stating that "an accused's right to compulsory process must give way to the witness' Fifth Amendment privilege not to give testimony that would tend to incriminate him"); *United States v. Turkish*, 623 F.2d 769, 774 (2d Cir.1980) (stating that "the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does not carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination"), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *United States v. Trejo–Zambrano*, 582 F.2d 460, 464 (9th Cir.) (stating that "[t]he Sixth Amendment right of an accused to compulsory process to secure the attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege"), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978); *State v. Simms*, 170 Conn. 206, 365 A.2d 821, 823 (stating same), *cert. denied*, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 199 (1976); *State v. Ramsey*, 99 Idaho 1, 576 P.2d 572, 573–74 (1978) (stating same).

■ In other words, if the trial judge concludes the proposed testimony would be incriminating and thereby poses the risk of possible future prosecution of the witness, this ends that inquiry and a claim of the privilege should be sustained. Consequently, once incrimination is determined or ceded, then without an absolute bar to subsequent prosecution such as double jeopardy, immunity, or the statute of limitations, the court should uphold the witness' privilege against self-incrimination.[1]

## IV.

We turn now to a different consideration, that is, the contention that, where a defense witness claims the privilege against self-incrimination, either defense witness immunity should be judicially imposed or the prosecutor should be required to grant immunity or risk dismissal of the indictment if the particular testimony is material and exculpatory. Preliminarily, we agree with the overwhelming number of courts, especially in the federal circuits, that have rejected the concept of *judicially imposed* immunity. *See, e.g., United States v. Doe, supra*, 465 U.S. at 616–17, 104 S.Ct. at 1244–45; *United States v. Baker*, 10 F.3d 1374, 1414 (9th Cir.1993), *cert.*

---

1. Any prior decision of this court in conflict fundamentally with this holding is, of course, necessarily overruled to this extent.

denied, —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994); *United States v. Quintanilla*, 2 F.3d 1469, 1483 (7th Cir.1993); *United States v. Mohney*, 949 F.2d 1397, 1401–02 (6th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *United States v. Lugg*, 282 U.S.App. D.C. 85, 88, 892 F.2d 101, 104 (1989); *United States v. Capozzi*, 883 F.2d 608, 612 n. 7 (8th Cir. 1989), *cert. denied*, 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990); *United States v. Chagra*, 669 F.2d 241, 258 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *United States v. Klauber*, 611 F.2d 512, 517 (4th Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *United States v. Housand*, 550 F.2d 818, 824 (2d Cir.), *cert. denied*, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977); *Earl v. United States*, 124 U.S.App. D.C. 77, 80 n. 1, 361 F.2d 531, 534 n. 1 (1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); *People v. Sanchez*, 131 Ill.2d 417, 137 Ill.Dec. 629, 634, 546 N.E.2d 574, 579 (1989); *State v. Peirce*, 364 N.W.2d 801, 808–09 (Minn.1985); *State v. Landrum*, 53 Ohio St.3d 107, 559 N.E.2d 710, 725 (1990), *cert. denied*, 498 U.S. 1127, 111 S.Ct. 1092, 112 L.Ed.2d 1196 (1991); *Commonwealth v. Johnson*, 507 Pa. 27, 487 A.2d 1320, 1321 (1985); *State v. Clark*, 576 A.2d 1202, 1206 (R.I.1990). *But see Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980) (sanctioning judicial immunity for defense witness).

■ We find quite persuasive an analysis of defense witness immunity in *Turkish, supra.* There, the Second Circuit rejected both the Sixth Amendment's Compulsory Process Clause and the Fifth Amendment's Due Process Clause (fair trial) as justifications for *judicial* immunity. The court rejected the argument, which was based on equalizing the powers of the prosecution and the defense, and the general need to pursue the truth. 623 F.2d at 774–75. In passing, the court observed penetratingly that "there is considerable force to the Government's apprehen-

sion that defense witness immunity could create opportunities for undermining the administration of justice by inviting cooperative perjury among law violators." *Id.* at 775. We agree with the *Turkish* court's conclusion that "[w]ithout precluding the possibility of some circumstances not now anticipated, we simply do not find in the Due Process Clause [or the Compulsory Process Clause] a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it." *Id.* at 777.

■ In agreeing with the court in *Turkish* we also reject, along with other courts, the Third Circuit's analysis in *Government of the Virgin Islands v. Smith, supra,* concluding that a court has *inherent authority* to immunize a witness capable of providing exculpatory testimony for a defendant. In *Smith,* the court was persuaded by arguments that the defendant was being denied an effective defense presentation due to the inability to introduce exculpatory testimony because a defense witness had invoked the privilege against self-incrimination. 615 F.2d at 970–71. Thus, that court proposed *judicially granted immunity* when the defendant established (a) the need for the testimony, and (b) the public interest would not be disserved by the grant of immunity. *Id.* at 973–74. However, "[e]very court of appeals which has considered the question [of court granted immunity] has rejected the Third Circuit's *Smith* holding as being a violation of the doctrine of separation of powers." *Capozzi, supra,* 883 F.2d at 614 (citing cases); *accord United States v. Angiulo,* 897 F.2d 1169, 1191 (1st Cir.) ("[t]his theory has been rejected by virtually every other court that has considered the issue" (citing cases)), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).[2]

### V.

We agree with most federal circuit courts which have adopted what has been termed the "prosecutorial misconduct" doctrine,[3]

---

**2.** *See also United States v. Quintanilla, supra,* 2 F.3d at 1483.

**3.** We recite those "prosecutorial misconduct" cases only for historical purposes. In actuality, there is no such misconduct here, however, as will appear later in the opinion; but this line of cases is historically relevant in exploring the defense immunity issue.

though there is actually no such conduct by the prosecutor in this proceeding. *See, e.g., United States v. Mohney, supra*, 949 F.2d at 1402; *United States v. Chalan*, 812 F.2d 1302, 1310 (10th Cir.1987); *United States v. Lord*, 711 F.2d 887, 891 (9th Cir.1983); *Turkish, supra*, 623 F.2d at 777. In *Virgin Islands v. Smith, supra*, the court stated that "under certain circumstances due process may require that *the government afford use immunity* for a defense witness." 615 F.2d at 968 (emphasis added). The *Smith* court noted that in *United States v. Morrison*, 535 F.2d 223 (3d Cir.1976), the court held that "where prosecutorial misconduct occurred (in that case, intimidation of a defense witness), the government could be directed to either obtain use immunity, so that the witness could testify, or suffer a judgment of acquittal." *Smith, supra*, 615 F.2d at 968. Thus, the *Smith* court concluded that when the prosecutor's decision not to provide immunity to a defense witness is made "with the deliberate intention of distorting the judicial factfinding process," the court will enter a judgment of acquittal unless the prosecutor consents to grant immunity. *Id.* at 968–69 (internal quotations omitted).[4]

This approach for prosecutorial misconduct first appeared in the District of Columbia Circuit in 1966 in *Earl, supra*.[5] The *Earl* court suggested in a footnote that prosecutorial misconduct in the application of the government's grant of immunity to some witnesses and not to others may violate due process. *Earl, supra*, 124 U.S.App. D.C. at 80 n. 1, 361 F.2d at 534 n. 1. The court stated that where the government gives immunity to a prosecution witness while declining to grant immunity to a similarly situated defense witness there could be a due process violation. *Id.* Other federal circuits have recognized that a trial court might have to order a judgment of acquittal unless the prosecutor

grants immunity for a defense witness when there is such "prosecutorial misconduct." *See, e.g., United States v. Bahadar*, 954 F.2d 821, 825–26 (2d Cir.), *cert. denied*, 506 U.S. 850, 113 S.Ct. 149, 121 L.Ed.2d 101 (1992); *Angiulo, supra*, 897 F.2d at 1191–92; *United States v. Herrera–Medina*, 853 F.2d 564, 568 (7th Cir.1988); *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir.1988); *Jeffers v. Ricketts*, 832 F.2d 476, 479 (9th Cir.1987), *rev'd on other grounds*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Lord, supra*, 711 F.2d at 891; *Morrison, supra*, 535 F.2d at 229. The Second Circuit has observed:

> Defense witness immunity is required only upon a showing that "(1) the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; and (2) *the witness' testimony will be material, exculpatory and not cumulative and is not obtainable from any other source.*"

*United States v. Rivera*, 971 F.2d 876, 887 (2d Cir.1992) (quoting *United States v. Burns*, 684 F.2d 1066, 1077 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983) (emphasis added)).

Sometimes, courts have reversed convictions when prosecutorial misconduct has occurred involving the denial of grants of immunity to defense witnesses or when threatening judicial conduct effectively causes the witness to invoke the Fifth Amendment right not to incriminate. In *Morrison, supra*, 535 F.2d at 227–28, the United States Attorney drove a potential defense witness to invoke the Fifth Amendment privilege by repeatedly warning the witness about perjury and potential prosecution for other crimes and by conducting an intimidating personal interview prior to

---

4. It was when the *Smith* court went on to vest the trial court with "the inherent authority to immunize a witness" that it went into error.

5. Any language in the opinion in *Earl v. United States, supra*, 124 U.S.App. D.C. 77, 361 F.2d 531 (no longer the law controlling on this court, *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971)), which may appear inferentially in conflict with this opinion is of no binding effect. This would also

necessarily apply to language in this court's opinions *In re J.W.Y.*, 363 A.2d 674 (D.C.1976), and *Terrell v. United States*, 294 A.2d 860 (D.C.1972). Significantly, *Earl v. United States, supra*, was decided in ·1966, when prior to the statutory grant of "use" immunity in 1970, transactional immunity was the only statutory immunity available.

the testimony. The court reversed the conviction due to the prosecutorial misconduct and as a remedy ordered that upon retrial, a judgment of acquittal be entered unless the government requested immunity for the witness under 18 U.S.C. §§ 6002–6003 (1995 & 1996 Supp.). *Id.* at 228–29. In *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), the Supreme Court reversed a conviction where the judge actually singled out the defendant's only witness for a lengthy admonition on the dangers of perjury and the probability of conviction for perjury if the witness testified and the witness then refused to testify; *see also United States v. Heller,* 830 F.2d 150 (11th Cir. 1987) (reversing a conviction where there were threats and interference by investigating IRS agents who coerced the witness accountant to testify falsely against the defendant).

In *Lord, supra,* the court remanded for fact-finding to determine whether the prosecutor had deliberately caused the witness to refuse to testify by telling the witness that although his part in the crime "was so minor that he really didn't want to prosecute me, but he would, depending on my testimony," 711 F.2d at 889. In *Smith, supra,* a defense witness would have identified his co-attackers as being persons other than several of the defendants. 615 F.2d at 966–67. The Virgin Islands Attorney General's office, which had exclusive jurisdiction to prosecute the witness, offered to grant that witness immunity if, out of concerns of comity, the United States Attorney failed to consent (which it did) and the court concluded this rose to the level of misconduct when no reason, let alone a legitimate reason, was put forward to justify the failure to consent. *Id.* In *United States v. De Palma,* 476 F.Supp. 775 (S.D.N.Y.1979), the trial court granted a new trial when the government selectively exercised its immunity power to enhance its case by granting immunity to some witnesses, but refusing to grant immunity to similarly situated defense witnesses.

Here, however, the prosecutor has committed no wrongdoing in its treatment of a defense witness or an immunity grant and so, with this judicial background, we proceed to consider the precise issue presented in this case.

## VI.

■ If an appropriate factual situation arises in the Fifth Amendment–Sixth Amendment context, we favor what has been termed "the carrot-and-stick approach." *United States v. Bahadar, supra,* 954 F.2d at 826. This leaves the defense witness immunity decision to the executive branch but reserves power in the judiciary "to subject the government to certain choices of action." *Id.*[6]

According to the Second Circuit in *Bahadar, supra,* defense witness immunity is required when "the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment." *Id.* (citing *United States v. Burns, supra,* 684 F.2d at 1067). Further, the witness' testimony giving rise to the problem must be (a) material, (b) exculpatory, (c) not cumulative, and (d) unobtainable from any other source. *United States v. Rivera, supra,* 971 F.2d at 887; *United States v. Todaro,* 744 F.2d 5, 9 (2d Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985); *Burns, supra,* 684 F.2d at 1077; *United States v. Calvente,* 722 F.2d 1019, 1025 (2d Cir.1983), *cert. denied,* 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985) (cited approvingly by *Bahadar, supra,* 954 F.2d at 826). These are stringent standards and deliberately so because of the intrusion into what would otherwise be the sole prerogative of the executive branch.

With this background, we now turn to the more difficult issue presented by the facts in

---

6. Interestingly, the United States Attorney Manual (9–23.214, Oct. 1, 1990) provides:

Granting Immunity to Compel Testimony on Behalf of Defendant

The provisions of 18 U.S.C. §§ 6001–6003 are not to be used to compel testimony or production of other information on behalf of a defendant *except in extraordinary circumstances where the defendant plainly would be deprived of a fair trial without such testimony or other information.*

[Emphasis added.]

this case where there is no prosecutorial misconduct but where the same Fifth Amendment due process and Sixth Amendment fair trial issues are presented.[7]

At oral argument in this case, the United States Attorney related to the court, in some detail, a worthwhile approach on this issue for consideration on occasions presenting these issues, assumedly where a defense witness possessing *material, exculpatory* and *non-cumulative* evidence which is *unobtainable from any other source* will invoke the Fifth Amendment privilege against self-incrimination unless granted executive "use" immunity.[8] The government proposed that such a witness could be debriefed by the government with an accompanying governmental award of a limited immunity solely for these debriefing purposes. Following a debriefing,[9] if the United States Attorney were to have a reasonable basis for not granting "use" immunity to the witness, such as, for example, considerations of potential future prosecution, an ongoing investigation, clear indications of potential perjury, or the excusable lack of information during the debriefing to make an informed immunity decision, *see Turkish, supra*, 623 F.2d at 775–76, and *United States v. Thevis*, 665 F.2d 616, 639–40 (5th Cir.1982), then, under such circumstances, or for some other enumerated sound reason, the refusal to immunize by the United States Attorney would hardly be prosecutorial misconduct, as discussed in the preceding cases. This is not to say that, in this connection, the prosecutor may in effect usurp the usual jury function of judging

credibility. But from the government's prior investigation of the facts, threat of a blatant perjury, for an example, may sometimes be so apparent as to be demonstrable to the trial judge. If so, the government could not reasonably be expected to cloak in advance such testimony with immunity.[10] The immunity of which we speak is the statutory "use immunity" as defined in 18 U.S.C. § 6002:

[N]o testimony or other information compelled ... (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

■ Thus, "use immunity" generally prevents the government from using, directly or indirectly, any statements made by an individual or any information derived from those statements, in subsequent criminal proceedings. *See, e.g., Kastigar, supra*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212; *Pillsbury v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983).

If, however, the government, after a sufficient debriefing of the potential witness, could provide no justifiable reason (a tactical advantage would not be sufficient) for not granting "use" immunity to the proposed vital defense witness, then, depending upon the factual situation, the failure to provide immunity may give rise to the question of whether this amounts to conduct which would, unless altered, result in a distortion of the fact-finding process.[11] If so, this may be seen as

---

7. It may be that in some cases the trial court, by judgment prudently exercised, may be able to generate an avoidance of an outright conflict between a defendant's Fifth and Sixth Amendment rights. *See, e.g., Carter v. United States*, 643 A.2d 348, 353–54 (D.C.1994) (vacated). Generally, this avoidance of the constitutional conflict is to be desired, though it would of course be unwise for this court blindly to require absolutely such a result in every case, as circumstances differ.

8. 18 U.S.C. §§ 6001–6005.

9. Though it is not now presented, there may possibly arise other methods of acquiring information adequate to determine intelligently

whether a proposed defense witness should be granted executive immunity.

10. As we have indicated, there may be a number of sound reasons for declining to cloak the proffered defense witness with governmental immunity.

11. When an intentional distortion by the prosecutor of the fact-finding process is encountered, some opinions refer to this conduct as "over-reaching." *See, e.g., United States v. Abbas*, 74 F.3d 506, 512 (4th Cir.1996); *United States v. Rivera, supra*, 971 F.2d at 887; *United States v. Capozzi, supra*, 883 F.2d at 615; *Harris v. United States, supra*, 614 A.2d at 1283 n. 10 (citing 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 138, at 515–16 (4th ed.1992)).

a denial of due process of law.[12] *See United States v. Bustamante*, 45 F.3d 933, 943 (5th Cir.1995) (use of immunity privilege to unfairly skew the facts presented to the jury violates defendant's due process rights). This is a question for an appropriate ruling by the trial court, after a summary hearing. *See United States v. Westerdahl*, 945 F.2d 1083, 1087 (9th Cir.1991).

If, after a hearing, the trial court were to conclude that, all circumstances considered, the defendant will not receive a fair trial without the testimony of a crucial defense witness whose testimony meets the mandatory requirements we have previously spelled out in this opinion (exculpatory evidence, etc.), and importantly, the government does not submit to the court a reasonable basis for not affording use immunity to the crucial witness in order to procure the vital defense testimony, then the trial court would be justified in informing the government that it must make the choice between dismissal of the indictment or some other *commensurate remedy* which the court may fashion[13] on Sixth Amendment and due process grounds, or affording use immunity to the crucial defense witness involved who is shown to be the only witness who, if believed, would clearly establish a reasonable doubt on the defendant's guilt.

In reaching its ruling on this issue, however, the trial court should be acutely aware that the exclusive constitutional authority to execute the laws and decide whom to prosecute lies in the executive branch. It is not for the judiciary to intrude into this prosecutorial function. In an appropriate case the trial court may present the prosecution with the choice of either dismissal of the indictment[14] (or some other commensurate remedy) or the grant of use immunity to the crucial defense witness,[15] as we have here

defined such a witness, if the court concludes the prosecutor is distorting the fact-finding process in relation to the issue.[16] Because of the separation of powers, it is of course not the function of the trial judge to evaluate the judgment of the prosecutor in conducting the trial. On this particular issue of defense witness immunity, the trial court should consider *only* whether, after the issue has been explored, the government is abusing its discretion and distorting the judicial fact-finding process in refusing to immunize a proffered *crucial* defense witness, thereby preventing a fair trial for the defendant. *Hooks, supra,* 848 F.2d at 799; *Bustamante, supra,* 45 F.3d at 943; *Jeffers v. Ricketts, supra,* 832 F.2d at 479; *United States v. Salerno,* 937 F.2d 797, 807 (2d Cir.1991), *rev'd on other grounds,* 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992).

Under this procedure, however, if the witness refuses to be debriefed by the government, notwithstanding a potential offer by the government to grant the foregoing limited immunity for the purpose of debriefing, prosecutorial bad faith would hardly be present if a formal grant of "use" immunity to the witness is refused by the government, as the prosecutor would not have obtained sufficient information to reach an intelligent conclusion for immunity purposes regarding the proposed testimony of the defense witness. So, the prosecutor would not then have acted unreasonably thereby denying the defendant due process of law. Although a witness may not be compelled to be debriefed, because limited immunity for a debriefing may be negotiated, this procedure would reasonably address due process and Sixth Amendment interests of a defendant under the circumstances.

---

12. We take note of the fact that, as with the District of Columbia's Corporation Counsel, not all prosecutor's have the authority to provide a defense witness with immunity.

13. It would, of course, be necessary that any other remedy fashioned by the trial judge must meet the requirement of ensuring the due process of law right to a fair trial for the defendant.

14. *But see* note 12, *supra.*

15. The trial court may, for example, explore whether restriction of cross-examination on that score would be a sound approach to a disposition of the problem.

16. If the trial judge concludes that in considering the issue an *in camera* proceeding is warranted in order to explore adequately the considerations involved, then this course is open to the court. *See Westerdahl, supra,* 945 F.2d at 1087.

## VII.

■ In differing with separate opinions in this case, it is our position that the thrust of the majority opinion emanates from settled law that the government has a constitutional duty to volunteer exculpatory evidence to a criminal defendant.[17] *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Trevino,* 89 F.3d 187 (4th Cir.1996). This constitutional obligation is not measured by the good faith or the bad faith of the prosecutor, *Agurs, supra,* 427 U.S. at 110, 96 S.Ct. at 2400, and those latter terms are employed in the objective not the personal sense.

When we set forth here the initial stringent four evidential standards (material, *exculpatory,* non-cumulative and not obtainable from any other source), the case is put into the context of whether without evidence of that nature, and assuming it can be made available, there can reasonably be a fair trial for the defendant. This was discussed at some length with the government at oral argument, during which the government expressed definite, measured views on the subject.

Turning to the focal point in this case, *i.e.,* the immunity issue—with immunity power of course being vested exclusively in the executive branch—the problem turns to whether, given a constitutional duty of the prosecutor to volunteer *exculpatory* evidence to a criminal defendant, the prosecutor should furnish the immunity key to unlock exculpatory evidence from the defense witness who is asserting the privilege against self-incrimination when asked to testify about that crucial information. We assume, of course, that the prosecutor would first be given the opportunity to explore the witness in order to determine whether the government could fairly be requested by the court to immunize that particular witness (for example, a showing of demonstrable perjury forthcoming from the proposed witness would justify denying immunity).

If after probing the proposed witness the prosecutor is not able to relate to the trial judge a sound reason for not immunizing the crucial defense witness, the government may be effectively blocking the defendant's access to a fair trial. Since it is settled law that the executive branch has a constitutional duty to volunteer exculpatory evidence to a defendant, the question arises as to whether there should be a related obligation to afford immunity to a crucial defense witness claiming the privilege against self-incrimination, so as to unlock that *exculpatory* testimony, always assuming the government can offer the trial judge no sound reason to withhold immunity from the particular witness. Under the circumstances, if the government declines to recognize such obligation, it would remain for the trial judge to consider an appropriate sanction in the proceeding, including dismissal of the indictment where warranted.

## VIII.

To summarize, the trial court is not required to assess the likelihood of prosecution when a potential defense witness refuses to testify due to the invocation of the privilege against self-incrimination. This was the *Jaggers* procedure, which is now no longer authorized. The process required now is limited to a determination by the trial court as to whether the testimony would be incriminatory and thus create the *possibility* of future prosecution. If so, the claim would have validity under the law.

■ If immunity of the crucial defense witness is then sought, the defendant must first establish to the trial court's satisfaction that the proposed testimony is (a) material, (b) clearly exculpatory, (c) non-cumulative, and (d) unobtainable from any other source. These conditions are mandatory. In the discretion of the trial judge, the defense proffer may initially be made *ex parte* by the defense, with the prosecutor thereafter becoming engaged in the process. If, on the initial

17. While government production of impeachment evidence (as well as exculpatory evidence) falls within the *Brady* rule, as we have made plain here, the defendant's proposed witness must be offering exculpatory evidence in order to begin to come within the rationale of this opinion.

showing, the trial judge concludes preliminarily that the process should continue, the next step might be to institute a debriefing process of the proposed defense witness by the prosecution in order to determine whether the government will accede to a grant of use immunity to the witness, which process may require some exploration as to the method of doing so, between the prosecutor and the defense witness or the latter's counsel.

 We anticipate that a debriefing procedure such as described by the government would, if implemented, provide the trial court with a suitable procedure to determine whether in the opinion of the trial court a proposed defense witness should be granted "use immunity" by the executive branch. In the trial court, the defendant should be required to raise this issue pre-trial, else it might seriously derail the trial if raised after it commences. Only for good cause shown should this pre-trial procedural requirement be altered.

 If after a debriefing procedure and investigation the government were to decline to grant "use" immunity to the proposed defense witness,[18] who by definition must possess *material, exculpatory, non-cumulative evidence, unobtainable from any other source,*[19] it would be for the trial court to explore the basis of the government's refusal and decide whether there will be a distortion of the fact-finding process and the indictment should therefore be dismissed for

a denial of due process and Sixth Amendment rights to the defendant, or some other communsurate remedy, unless the government agrees to grant "use" immunity to the crucial witness.[20] The grant of immunity is of course an executive not a judicial function.[21] We would expect, however, that the procedure here suggested by the government in the matter of advance defense witness debriefing, or some other suitable procedure in order to determine whether immunity is warranted, would naturally be pursued in good faith and would provide the trial court with a means to balance the legitimate governmental interest with the defendant's Sixth Amendment right to compulsory process and Fifth Amendment right to due process of law by way of a fair trial.

This is a procedure to be pursued cautiously, however, and with especial regard for the public interest,[22] as it goes further than the doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (where there was evidence in the government's possession), and imposes a governmental burden, depending upon the particular facts, "to assist the defense in extracting from others evidence the Government does not have." *Turkish, supra,* 623 F.2d at 775. It should be apparent from this opinion that due to the separation of powers, this process has strict confines, and deliberately so. But, balancing all the considerations, we consider that if fairly administered, as we necessarily assume

---

18. *See, e.g.,* 18 U.S.C. §§ 6002–6003.

19. If the proposed testimony of the witness does not meet these qualifications, the inquiry should not proceed unless a compelling reason not now apparent is presented for altering these four basic requirements.

20. In unusual factual circumstances where, for example, the government engages in a selective use of its statutory immunity authority, as between government and defense witnesses, as we have indicated earlier, the trial judge might fashion an appropriate remedy, such as ordering a new trial with the testimony of a particular government witness favored with an immunity grant excluded unless a defense witness in a similar situation is also granted immunity. It is, however, unwise now to project appropriate future trial court rulings, which will turn upon numerous different factual circumstances, not now foreseeable. In circumstances of this nature, the aim of

the trial court will of course be to ensure a fair trial to the defendant by affording due process of law, with due regard to the particular circumstances of the case. *See, e.g., United States v. Capozzi, supra,* 883 F.2d at 613; *United States v. Klauber, supra,* 611 F.2d at 518 (citing *De Palma, supra,* 476 F.Supp. at 781–82).

21. *E.g., United States v. Turkish, supra,* 623 F.2d at 776; *United States v. Lang,* 589 F.2d 92, 95–96 (2d Cir.1978).

22. As we stated earlier, there should be a realistic awareness of the potential opportunities for "inviting cooperative perjury among law violators," as the Second Circuit pointed out in *Turkish, supra,* 623 F.2d at 775. It will be the government's burden to guard against it. The trial court should understand this.

it would be, it has sound constitutional underpinning.

*Remanded for further proceedings consistent with this opinion.*[23]

TERRY, Associate Judge, concurring:

As I read what Judge Gallagher has written, he is not saying that the trial court has the power to grant immunity to a witness over the objection of the prosecution. Indeed, he could not, for the Supreme Court has made it absolutely clear that "[n]o court has authority to immunize a witness." *Pillsbury Co. v. Conboy,* 459 U.S. 248, 261, 103 S.Ct. 608, 616, 74 L.Ed.2d 430 (1983). Unwavering case law in the District of Columbia is to the same effect. *See, e.g., Taylor v. United States,* 603 A.2d 451, 460 (D.C.) (citing cases), *cert. denied,* 506 U.S. 852, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992); *United States v. Lugg,* 282 U.S.App. D.C. 85, 88, 892 F.2d 101, 104 (1989) (recognizing the "universal rule" that only the executive branch has the power to grant immunity and holding that the trial court "had no power" to do so). With that understanding, I join in the court's opinion.

WAGNER, Chief Judge, concurring in part, and dissenting in part.

## I.

I join in Parts I–V of the court's opinion, but I respectfully dissent from Parts VI–VIII. In my opinion, this court exceeds its power in imposing upon the Executive Branch the "debriefing" procedure it adopts today, unfortunately without the benefit of briefing by either party in this case. This new procedure would require the government to grant limited immunity to defense witnesses asserting the Fifth Amendment privilege for debriefing purposes as a step preliminary to the trial court's inquiry into whether the prosecutor withholds use immu-

nity for an improper purpose.[1] Even absent evidence or allegation of bad motive, the court also places upon the prosecutor the burden of demonstrating that the reasons for withholding use immunity are justified. Congress expressly left the decision to seek witness immunity "exclusively to the Justice Department." *United States v. Doe,* 465 U.S. 605, 616, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552 (1984); *United States v. Mohney,* 949 F.2d 1397, 1401 (6th Cir.1991); *Earl v. United States,* 124 U.S.App. D.C. 77, 80, 361 F.2d 531, 534 (1966). Therefore, in commanding the executive branch to exercise that statutory power, even for limited purposes, this court intrudes into an area preeminently the domain of the executive branch of government. *See United States v. Bahadar,* 954 F.2d 821, 825 (2d Cir.1992); *see also* 18 U.S.C. § 6003(a). Moreover, the mechanism the court creates for scrutinizing the prosecutor's immunity decisions, in my view, imposes a difficult burden upon the executive branch and places the court improperly in the position of second-guessing whether immunity is appropriate in a particular case. *See United States v. Turkish,* 623 F.2d 769, 776 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

Contrary to its expressed intention of adopting the stringent standard, set forth in *Bahadar,* for the court's use of its coercive powers to force the government to grant immunity in certain rare cases, this court appears to adopt a much more lenient standard. Under the standard set forth in *Bahadar,* the threshold requirement for forcing the government to grant a proffered defense witness immunity or risk dismissal is that "the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment." *Bahadar, supra,* 954 F.2d at 826. Since, as the majority points out, the

---

**23.** In reference to Judge King's dissent, it may be that, if the defendant requests a remand proceeding he will be unable to meet the exacting tests required by our opinion and the trial judge will terminate the proceeding at the very outset. We, of course, expect the trial court to proceed reasonably in accordance with our opinion, with due regard for the circumstances presented upon

remand. We differ with his dissent as we see no need now to anticipate and rule upon the factual situation the parties will probably present to the trial court. The trial court will be well able to deal with the situation as it develops there.

**1.** See majority opinion, Part VI.

prosecutor in this case "has committed no wrongdoing in its treatment of the defense witness or an immunity grant,"[2] under *Bahadar*, the defense failed to "vault [that] first hurdle." *See id.* Thus, assuming the efficacy of adopting the *Bahadar* approach, the claim for immunity must fail on this record, and no remand is required. *See id.* For these reasons and those which follow, while I join in Parts I through V of the opinion, I respectfully dissent from Parts VI–VIII.

## II.

There are several relevant general propositions with which all seem to agree. The controlling statute, 18 U.S.C. § 6002 *et seq.*, "does not require the government to grant a defense witness immunity." *Mohney, supra,* 949 F.2d at 1401. Nor does the Fifth Amendment impose an obligation upon the prosecutor to grant immunity "whenever it seems fair to grant it." *Turkish, supra,* 623 F.2d at 777; *Bahadar, supra,* 954 F.2d at 825. Although immunity remains " 'pre-eminently a function of the [e]xecutive [b]ranch,' " *United States v. Salerno,* 937 F.2d 797, 807 (2d Cir.1991) (quoting *Turkish,* 623 F.2d at 776 (other citations omitted)), two theories have developed under which courts have determined that the government might be required to grant defense witness immunity or risk sanction. "The first theory, rejected by most courts, allows immunity for defense witnesses when necessary for an effective defense." *Mohney,* 949 F.2d at 1401; *see also Virgin Islands v. Smith,* 615 F.2d 964, 973–74 (3d Cir.1980). The second theory imposes such a requirement upon the government as a remedy for "prosecutorial misconduct." *Mohney,* 949 F.2d at 1401; *Bahadar,* 954 F.2d at 826. It is not clear which theory the court adopts today, as the guideline established seems to comprise elements of both.

2. Majority opinion at 341.

3. Significantly, the court in *Bahadar* observed that

 although our test for requiring the government to grant use immunity has been in place for at least eight years, we have yet to be presented

In *Bahadar,* the court set forth a three-part test for determining the circumstances under which the government would be required to grant immunity or risk dismissal of the case. These include: (1) that the court find that "the government has engaged in discriminatory use of immunity to gain a tactical advantage," or by overreaching forced the witness to invoke the privilege; (2) the witness' testimony must be " 'material, exculpatory, and not cumulative;' " and (3) the testimony must not be available from another source. *Bahadar, supra,* 954 F.2d at 826 (quoting *United States v. Burns,* 684 F.2d 1066, 1077 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)). The court rejected the claim in *Bahadar* because the defense could not meet the first requirement. The court determined that the witness' invocation of the Fifth Amendment, out of fear of prosecution for his prior inconsistent statements to government agents, resulted from the witness' willingness to change his story and not from the prosecutor's overreaching or discriminatory use of immunity. *Id.* The *Bahadar* test is a stringent one, which would allow court intervention into an area statutorily reserved exclusively to the executive branch only in extraordinary situations. *See id.*[3]

What appears to be a less stringent test is found in *Smith, supra,* which includes the following elements:

> [I]mmunity must be properly sought in the district court; the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity.

615 F.2d at 972. *Smith* holds that a court has the power to order the prosecutor to confer immunity upon a defense witness if it finds "prosecutorial misconduct by the government's deliberate intent to disrupt the fact finding process." *Id.* at 975.[4] Even absent prosecutorial misconduct, immunity

with a case in which the defendant gets over the first hurdle, let alone succeeds entirely. *Id.* at 826.

4. I agree with the majority in rejecting the proposition that courts have the inherent power to immunize defense witnesses. See majority opinion at 339 and 340 note 4.

may be granted under *Smith* if the potential witness can offer clearly exculpatory and material testimony and if the government has "no strong interest in withholding use immunity." [5] *Id.* at 974; *see also Turkish, supra,* 623 F.2d at 776. The majority states at the outset that it favors the *Bahadar* approach; however, it suggests an inquiry which focuses upon the prosecutor's ability to provide a "justifiable reason ... for not granting 'use' immunity" to the witness.[6] This approach is more akin to the lenient standard adopted by the Second Circuit in *Smith,* which sanctions court intervention when "the government has no strong interest in withholding use immunity." *Smith,* 615 F.2d at 974. Such an approach is fraught with difficulties, aptly outlined in *Turkish* and quoted in the margin.[7] That the issues are difficult and the approaches are many does not preclude their consideration. However, these concerns dictate the wisdom of deferring their determination until there is a factual context which requires their resolution and the relevant legal issues have been presented for consideration in the adversary process.

## III.

The resolution of a conflict between a witness' Fifth Amendment privilege and a defendant's Sixth Amendment right to compulsory process, which this court addresses in this case, has long been a troubling one. However, it is an area where there is clear law which resolves that conflict in favor of the witness' right to remain silent. *See Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972) (The power to compel testimony is subject to the exemption of testimony privileged under the Fifth Amendment.); *Hoffman v. United States,* 341 U.S. 479, 490, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1951) (The evils of compulsory self-incrimination transcend any difficulties that exercise of the Fifth Amendment privilege may impose upon society in the prosecution and detection of crime.); *United States v. Cuthel,* 903 F.2d 1381, 1384 (11th Cir.1990) (The conflict between a defendant's right to compel testimony and a witness' Fifth Amendment privilege has been resolved in favor of the latter.); *Turkish, supra,* 623 F.2d at 773–74 (The Sixth Amendment's right to compulsory process does not displace a proper claim of privilege against self-incrimination.). In the context of a request for courts to compel defense witness immunity, most courts seem to have reserved any con-

5. The *Smith* court remanded for an evidentiary hearing because it determined that the record established that the defense could meet the requirements of either theory. *Smith, supra,* 615 F.2d at 974. However, *Smith* presented exceptional circumstances not presented here. The prosecutor with jurisdiction to prosecute the potential witness had offered to grant the witness use immunity provided the United States Attorney consented, a condition imposed as a matter of courtesy. *Id.* at 967. There was no apparent reason for the U.S. Attorney, who lacked jurisdiction to prosecute, to withhold consent. Therefore, it appears that "[t]his was simply an instance of a prosecutor interfering, for no apparent reason, to suppress evidence that was about to become available to the accused." *Turkish, supra,* 623 F.2d at 777.

6. See majority opinion at 342.

7. In commenting upon the *Smith* approach, the *Turkish* court observed:

Smith suggests two types of inquiry: whether the prosecutor's opposition to defense witness immunity stems from "the deliberate intention of distorting the fact finding process," or whether the prosecutor can present "strong countervailing interest," to the defendant's

need for clearly exculpatory evidence. Either inquiry will propel a trial court into uncharted waters. Focusing upon the prosecutor's intent will often lead to exploration and premature disclosure of the pending status of an investigation against the witness. Moreover, a prosecutor without enough evidence to seek indictment of a witness may legitimately prefer to maintain his option to prosecute on the basis of later information. It cannot fairly be argued, where the prosecutor declines to consent to use immunity, that the absence of present intention to prosecute is evidence of intention to distort the fact-finding process. Alternatively, weighing the "countervailing interest" in not granting defense witness immunity will in all likelihood prove to be as elusive a task as formulating any meaningful standards for the assessment. In the extraordinary fact situation presented by the *Smith* case, ... the public interest in not granting defense witness immunity appears to be non-existent. But in most situations where defense witness immunity is likely to be sought, some legitimate opposing prosecution interest will exist, and constitutional fairness is not a satisfactory standard against which to assess such interests.
*Turkish, supra,* 623 F.2d at 776–77 (quoting *Smith, supra,* 615 F.2d at 968, 974).

sideration of court intervention for the rare case involving improper action by the prosecution which could be found to deny constitutional fairness. *See, e.g., Mohney, supra,* 949 F.2d at 1402; *Turkish,* 623 F.2d at 777; *see also Earl, supra,* 124 U.S.App. D.C. at 80 n. 1, 361 F.2d at 534 n. 1. Where there is evidence of improper conduct of the prosecution, traditional sanctions might be available to address the situation, at no risk of improper intrusion into an executive function. *See Salerno, supra,* 937 F.2d at 807–08. In light of the separation of powers issues involved when courts seek to intrude into an area statutorily reserved for the executive branch, the more stringent *Bahadar* standard, discussed in Part I of this opinion, appears to be the better approach. To the extent that the majority departs from that standard, I disagree.

In *Bahadar,* the court adopted, as the majority states that it does here, a "carrot and stick approach, leaving the immunity decision to the executive branch but interposing the judicial power to subject the government to certain choices." [8] *Bahadar, supra,* 954 F.2d at 826 (citing *Salerno, supra,* 937 F.2d at 807–08 (other citation omitted)). However, the prosecutor's choice in *Salerno* was not between granting immunity to a defense witness or terminating the prosecution, and the court had no occasion to intrude into the executive function. The *Salerno* court ruled that the grand jury testimony of two exculpatory witnesses, which the government disclosed under *Brady,* could be used at trial since they were unavailable because of their assertion of the Fifth Amendment privilege against self-incrimination and the government declined to grant immunity. The court's ruling was an evidentiary one, uniquely a judicial function, based upon the application and interpretation of FED.R.EVID. 804(b)(1). 937 F.2d at 807. The choice facing the prosecutor, though arising out of the court's decision, was not a coercive measure taken for the purpose of achieving that result. That choice was between granting immunity so that the witnesses would be available for cross-examination at trial or having only the grand jury testimony admitted.

Thus, the *Salerno* court in referring to the "carrot and stick," contemplated no deviation from the remedies available to address government misconduct. In that case, if the prosecutor preferred to have the opportunity to cross-examine the witnesses at trial, he could have granted the witnesses immunity. In *Bahadar,* as previously stated, the defense could not meet the first criterion for the court to take action to compel immunity. *Bahadar,* 954 F.2d at 826.

## IV.

Finally, a review of the tape recording of the argument in this case will reveal that the government did not propose or approve the debriefing procedure adopted by the majority. In responding to a question by one member of the court, the prosecutor indicated simply that if a witness were tendered for debriefing in connection with a request for immunity, the government would want to avail itself of that opportunity. However, the prosecutor stated that she knew of no precedent which would require the government to investigate the case for the defense in that way. The prosecutor also stressed that (1) the court did not have the power to grant immunity or to require the government to grant immunity, particularly because of separation of powers considerations; and (2) the court need not address the issue in this case because it was not raised by the facts. Therefore, the procedure the court adopts in this case cannot be attributed to any proposal by the government.

For the foregoing reasons, I respectfully dissent from Parts VI–VIII, except for paragraph 1 of section VIII, of the opinion of the court.

KING, Associate Judge, concurring, but dissenting from the remand:

I join Judge Gallagher's opinion in its entirety except for the determination that the case be "Remanded for further proceeding consistent with this opinion."

At the trial in this case, the judge applied the law which we decide today controls the

---

8. See majority opinion at 341.

issues presented in this case. The trial judge upheld the witness's self-incrimination claim, ruling that the "prospect of prosecution ... is real albeit not substantial." Today we hold that "if the trial judge concludes the proposed testimony would be incriminating and thereby poses the risk of possible future prosecution of the witness, this ends that inquiry and a claim of privilege should be sustained." *Ante* at 338. I can discern no difference between the rule laid down by us today and the ruling made by the trial judge. In short, the trial judge properly applied the law.

It is a complete mystery to me what action the majority expects the trial judge to take after remand. As I have said, the trial judge correctly applied the law and it seems to me that should end the matter. Does the majority expect the trial judge, on remand, to direct the parties and the witness to go back into time, placing themselves in the situation they found themselves at the trial, and to then undertake the procedure outlined in Parts VI and VII of the *en banc* opinion? I doubt that such a reconstruction of the past can practically be done.[1]

If, however, the trial court analyzes the issues, as of the time of remand, then the *result is preordained*—because the alleged drug use occurred ten years ago, the statute of limitation has long since run; therefore, the witness could not be prosecuted, and no claim of privilege against self-incrimination would lie. *See Jaggers v. United States,* 482 A.2d 786, 793 (D.C.1984) ("privilege [does not] exist where the statute of limitation has run"); D.C.Code § 23–113 (1996 Repl.) (statute of limitation for all offenses other than murder and other felonies is three years).

At the very least, this court should provide some guidance to the trial court concerning what is expected upon remand.

RUIZ, Associate Judge, concurring in part and dissenting in part:

I join Parts I–V and VII of the majority opinion and agree with the need to remand the case for further proceedings. Because there can be no doubt that the proffered defense witness had a valid Fifth Amendment privilege, on remand the trial court must evaluate whether the prosecutor's decision not to immunize the witness—resulting in the exclusion of testimony that, if material, exculpatory, noncumulative and unobtainable from another source, would distort the fact-finding process—is justified when weighed against the appellant's right to present a defense and to a fair trial. If the trial court considers that the prosecutor's decision is not so justified, the trial court must put the prosecutor to a choice between continued refusal to grant immunity and a commensurate sanction, which may include certain controls imposed on the trial proceedings, such as restricting the government's examination of the witness concerning the privileged matter, or dismissal of the indictment.

I wish to emphasize a principle touched upon in the majority opinion. When faced with the kind of situation presented in this case where competing constitutional rights are asserted, it is the trial court's responsibility to avoid a conflict between them and to accommodate all of them, if at all possible. Although it is said that a witness's Fifth Amendment privilege prevails over a defendant's Fifth and Sixth Amendment rights, *ante* at 336, that is true only in the sense that the witness cannot be forced to waive a valid privilege. It does not mean, however, that the defendant's constitutional rights are eliminated. What it does mean is that all the participants in the trial, under the guidance of the trial court, must actively attempt to find means around the problem. As the majority opinion correctly notes, where a possible solution is the grant of immunity, an executive prerogative, that avenue must be pursued by the trial court with care not to

---

1. On the other hand, because the proffered testimony, *ante* at 333, is more in the nature of impeachment of the complainant's testimony than substantive evidence of Carter's innocence, I question whether the defense will be able to overcome the threshold requirement that it establish that the prospective witness possessed *"material, exculpatory, non-cumulative evidence,*

*unobtainable from any other source." Ante* at 344 n. 17 & 28. That burden is a heavy one, requiring, in the words of the majority, that the defense show that Carter's brother is "the *only* witness who, if believed, would clearly establish a reasonable doubt on the defendant's guilt." *Ante* at 343 (emphasis added).

intrude upon the executive function.[1] A grant of immunity, however, is not necessarily the only option, as noted in Part II. A ("The Road Not Taken") of the panel majority's opinion. *Carter v. United States,* 643 A.2d 348, 353–54 (D.C.1994).

In Parts VI and VIII, the majority opinion adopts a "debriefing procedure" to assist trial courts in evaluating the government's refusal to grant immunity. It is only at this point that I disagree with the majority. First, as mentioned above, immunity is but one possible way to address a conflict between the defendant's constitutional rights and the witness's Fifth Amendment privilege. Even assuming that a specific case is focused on whether immunity should have been granted so as to defeat the witness's Fifth Amendment privilege, I believe it is premature for this court to say that the debriefing procedure described in the majority opinion will discharge the responsibility to find means around the competing constitutional rights of the defendant and the witness. No such procedure was used in this case or even presented to the trial judge; the matter came up for the first time during the government's presentation at oral argument to this *en banc* court. Although we have not had the benefit of appellant's considered comments on the debriefing procedure, I agree with one point of the majority in this regard, *ante* at 342, which is that a counseled witness with a valid Fifth Amendment privilege would only agree to be debriefed with a grant of *statutory* use immunity, which includes immunity from derivative use. *See* 18 U.S.C. § 6002–03 (1994) (providing procedures to immunize testimony "in a proceeding before or ancillary to ... a court or grand jury of the United States," and provid-

ing further that when ordered to provide information under that section, "the witness may not refuse to comply"); *see Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

However, the majority's suggestion that the debriefing can be effected with the grant of statutory use immunity is a procedure I doubt that the government will recognize as the one it suggested at oral argument.[2] Obtaining even a limited statutory immunity grant requires procedural hurdles—such as petitioning the United States District Court for an order with the approval of the Attorney General—that I do not believe the government offered to undertake solely for the purpose of a debriefing where the primary beneficiary of the witness's testimony would be the defense.

To the extent that the majority's opinion would permit, as I believe the government suggested at argument, a grant of non-statutory, informal use immunity to overcome the witness's recalcitrance in the debriefing, this suggestion is likely to be ineffective in light of the Supreme Court's opinion in *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), in which a non-statutory grant of use immunity was deemed insufficient to overcome a valid claim of privilege. Because non-statutory, "letter" use immunity would not permit the trial court to *compel* a witness to provide self-incriminating information, without that trial court compulsion and the threat of contempt for noncompliance,[3] all but the most magnanimous counseled witness would be without incentive to cooperate.

At any rate, it is clear that the whole issue needs further thought; we should only address it after input from the parties and

---

1. Even so, it is well to remember that where the government decides to immunize a witness, in the event that the trial court determines that exclusion of a proffered defense witness in a particular case cannot be reconciled with the defendant's constitutional rights to present a defense and to due process, the result is not denial of the ability to prosecute the witness, but a prohibition on the use of the immunized testimony in any prosecution that may be brought against the witness. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

2. Using 18 U.S.C. § 6001–6005 (1994) to immunize a witness's statements in a debriefing without also immunizing his trial testimony in the same proceedings appears to be unprecedented, and may not be permissible under the statute's language which contemplates "testimony," presumably given as part of an official proceeding and subject to compulsion.

3. The possibility of contempt arises under a variety of provisions, including 18 U.S.C. § 6002, D.C.Code § 11–944 (1995), and Superior Court Rules of Criminal Procedure 17 and 42.

experience with actual implementation under the guidance of trial courts. Because potential conflicts of constitutional rights concerning a defense witness's Fifth Amendment privilege can be addressed in a variety of ways, cases in which the defendant asserts a right to present a witness's self-incriminating testimony need to be addressed on a case-by-case basis by trial courts alert to their responsibility to actively endeavor to accommodate competing constitutional rights. No one approach or procedure is likely to be effective in all cases.

SCHWELB, Associate Judge, dissenting:

The majority holds today that a criminal defendant's right to call a witness in his own defense is trumped by the prospective witness' privilege against self-incrimination even where the judge has found both that the witness' testimony is essential to the defendant's case and that there is no practical possibility that the witness will in fact be prosecuted. In so holding, the court overrules a line of cases which balanced the interests involved reasonably and sensitively, to the apparent satisfaction of defendants, witnesses, and prosecutors. The result of the majority's ruling will be that, to a substantially greater degree than before, the opportunity of some defendants to present exculpatory testimony, and thus to receive a fair trial, will depend not on an objective determination by the judge, but rather on the tender mercies of a prosecutor who has previously been instructed to grant use immunity to a defense witness only in "exceptional circumstances." In my view, the new rule will deny some defendants the opportunity to call witnesses whom they should have the right to call, and whom they could have called under prior law. As a result, innocent defendants may be found guilty. Because I am aware of no legitimate interest that will

be served by this unnecessary departure from fair and equitable procedure, I respectfully dissent.

## I.

## IF IT AIN'T BROKE, DON'T FIX IT

A majority of this court apparently decided to "go en banc" in this case in order to overrule Jaggers v. United States, 482 A.2d 786 (D.C.1984) (per curiam), on account of that decision's perceived doctrinal flaws. My colleagues' dissatisfaction with prior law is purely theoretical, for I know of no practical harm that Jaggers was doing to the rights of any participant in the judicial process.

Jaggers was decided in 1984, but it was not an especially Orwellian or otherwise ominous case. The error which critics of Jaggers perceive in that decision is supposed to be that the court construed too narrowly the Fifth Amendment rights of defense witnesses. So far as I am aware, however, there has not been a single case, in the dozen years since Jaggers came down, in which a defense witness has complained to this court that he was compelled to incriminate himself, or that he was held in criminal contempt for refusing to incriminate himself, as a result of the rule in Jaggers. If any witness in this jurisdiction had been convicted of an offense on the basis of a disclosure which a court had required him or her to make because of Jaggers, or if such a witness had been harmed in some other way, then the resourceful attorneys for the government, well aware that proof of an actual injury would have a good deal more juridical sex appeal than a showing of purely theoretical harm, would surely have told us about it. I therefore think it is fair to infer that the government has not identified such a case because there has been no such case.[1]

1. Even the "worst case" scenario under Jaggers—one that evidently has not yet occurred—would not really endanger the rights of the witness. Suppose that the judge concluded that the possibility of prosecution was imaginary and trivial rather than real and substantial, but that the United States Attorney subsequently disagreed and attempted to use the compelled testimony in a subsequent prosecution of the witness. The Supreme Court has stated that "if [the witness] is

nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution." Lefkowitz v. Turley, 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). Thus, as a practical matter, a judge's ruling that the witness may not invoke his privilege against self-incrimination would protect the witness even in the event that the prosecutor subsequently acted in a manner inconsistent with the judge's expectations.

My thesis that the perceived shortcomings of the *Jaggers* doctrine were of an entirely theoretical character, and that they did not interfere with any party's legitimate interest, find further support in the government's effective acquiescence in the doctrine for more than a decade. Judge Kern, dissenting in *Jaggers,* 482 A.2d at 800, and Judge Gallagher, dissenting from the division opinion in the present case, *Carter v. United States,* 643 A.2d 348, 361–62 (D.C.1994) (*Carter I* ),[2] both argued that the majority in *Jaggers* had impermissibly ignored this court's earlier decision in *Alston v. United States,* 383 A.2d 307, 312 (D.C.1978), allegedly in violation of the rule of *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). Whether this thesis is right or wrong, it provided the government with a theory on which it could have attacked *Jaggers'* reasoning before a division of the court without asking the division to exceed its authority. Nevertheless, for a dozen years, the government has repeatedly assumed and accepted the correctness of the *Jaggers'* decision.

In the present case, in which the prosecution's prospects of victory would obviously be substantially better under *Alston* alone than under *Alston, Jaggers,* and *Jaggers'* progeny combined, the government never challenged the correctness of *Jaggers* before the division. On the contrary, the government got into the act only after Judge Gallagher, dissenting in *Carter I,* 643 A.2d at 362, explicitly invited reconsideration of *Jaggers* by the court sitting *en banc.*[3] If *Jaggers* and the cases that have followed *Jaggers* had impaired any legitimate right of the prosecution, the government would surely have complained long ago.

The theoretical issue now before the *en banc* court is undoubtedly an interesting one with respect to which reasonable judges can

and do disagree. Nevertheless, where, as here, a practice has been in effect for more than a decade without anyone claiming to have been injured by it, I think we should have left well enough alone, in conformity with the grammatically flawed but substantively wise slang aphorism which I have used as the heading of this portion of my dissent.

## II.

### THE FLAWS OF *CARTER II*

Unfortunately, the *Jaggers* approach, to which no witness or other affected party has apparently objected for a dozen years, is being replaced by the new *Carter II* approach, to which many defendants will most assuredly object, and with good reason.[4] The effect of the majority's decision will be to deny a defendant the opportunity to call a witness who has a theoretical Fifth Amendment problem, even if the judge is of the opinion that, in the real world, the practical possibility that the witness will be prosecuted is nil. The harm to the defendant's rights under the Sixth Amendment is palpable; the benefit to the witness is illusory.

I recognize that the new rule does not leave the defendant without any hope at all in the kind of situation which arose here. The government may, in an abundance of generosity, grant a defense witness use immunity under the new *Carter II* standard. As the majority recognizes, however, the United States Attorney's Manual itself permits such immunization of a defense witness only in "exceptional circumstances." With a directive like that, a prosecutor cannot reasonably be expected to go out of his way very often on behalf of his adversary in a vigorously contested criminal case.

The government has suggested a "debriefing" procedure for prospective defense wit-

---

**2.** I will refer to today's *en banc* decision as *Carter II.*

**3.** In general, a party is not entitled to consideration on rehearing of an issue which it failed to raise before the division. *See, e.g., U.S. v. Smith,* 781 F.2d 184, 185 (10th Cir.1986); *Marion Steam Shovel Co. v. Bertino,* 82 F.2d 945, 948 (8th Cir.), *cert. denied,* 299 U.S. 556, 57 S.Ct. 17, 81 L.Ed. 409 (1936). In light of *Alston,* the

government was free to urge the division to reject *Jaggers,* and such a request would not necessarily have been futile, for the division had the power to grant it.

**4.** Ironically, the time may come when the government also objects, for the remedy suggested by the majority for extreme cases—dismissal of the indictment—is a good deal more drastic and intrusive than the *Jaggers* approach.

nesses, and the majority finds merit in the suggestion. Given the majority's basic disposition of the constitutional issue, I suppose that the proposal is a constructive one, and Judge Gallagher has done his best to make it as fair as it can be in a situation in which the prosecutor will be accorded such wide discretion. Realistically, however, I do not think that this procedure will work very well. There is little incentive for a witness to submit to such "debriefing," and I suspect that most attorneys will advise their clients to pass such an opportunity by.

From the defense point of view, the government's proposal is intrinsically objectionable because it makes the defendant's right to secure the testimony of a witness—even of a witness who is not in any realistic danger of prosecution—contingent upon the willingness of that witness to cooperate in the debriefing procedure. Under *Jaggers,* if there was no real prospect that the witness would be prosecuted, the witness would have to testify, whether he wanted to or not. Defense counsel's subpoena, in other words, would not have to say please. Under *Carter II,* the unwillingness of the witness to submit to debriefing ends the defendant's hope of obtaining the witness' testimony, no matter how exculpatory the testimony may be, and regardless of how unlikely it is that the witness will actually be prosecuted.

Let us compare the operation of *Jaggers* with the operation of *Carter II* in a situation where the choice between the two approaches makes a real difference. Suppose that the judge, after hearing from all concerned, determines that the testimony of a prospective defense witness could legally facilitate his prosecution. The judge further finds, however, after examining the government's uniform practice over a period of years, that the prospects of prosecution are trifling and fanciful, rather than real and substantial. Under *Jaggers,*

1. the defendant was allowed to present the testimony of the witness;

2. that testimony, having been compelled by the judge, could not be used against the witness;[5] and

3. the government was thus powerless to prosecute the witness on the basis of his testimony.

Under *Carter II,* on the other hand,

1. the defendant can call the witness only if the government discerns "exceptional circumstances" and grants immunity, or if the court finds misconduct by the prosecution, neither of which is an event likely to happen often;

2. there will be no testimony for the government to use against the witness;

3. the government will thus have no basis for prosecuting the witness.

The results of our comparison are apparent. For the witness and for the government, the consequences under the two procedures are essentially the same. For the defendant, however, they are dramatically different. Under *Jaggers,* the defendant had the opportunity to present the testimony of the witness. Under *Carter II,* he ordinarily does not. From the perspective of the public interest, the judge and the jury were in most cases in a position to hear relevant evidence under *Jaggers,* but they will usually be denied access to that evidence under *Carter II.* Moreover, in what will doubtless be the rare case in which the court concludes that immunity was wrongfully withheld, the remedy may well be the dismissal of the prosecution, which will preclude a disposition of the case on the merits.

In one respect, the *Carter II* rule will be more favorable to the government than the *Jaggers* rule was. The prosecution will have more leeway in preventing the defense from calling witnesses, simply by refusing to grant use immunity even to those who, if the government's conventional procedures were followed, would not be prosecuted at all. The judge may interfere, under the majority's approach, only if he or she finds prosecutorial "over-reaching" or deliberate "distortion of the fact-finding process." Although the majority's stated test is whether the government has "submit[ted] to the court a reasonable basis for not affording use immunity,"

---

**5.** *See Lefkowitz, supra* note 1, 414 U.S. at 78, 94 S.Ct. at 322.

unreasonableness in this context apparently requires bad intent or its equivalent.[6]

Under *Jaggers*, on the other hand, it was not necessary to explore the depths of the prosecutorial soul for the presence of impermissible motivation. Rather, the judge made an *objective* determination as to whether the possibility of prosecution was real or illusory. *Jaggers* had it right, for "[i]t is of no consolation to an individual denied [his constitutional rights] that it was done in good faith." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961).[7]

### III.

### TREATING DIFFERENT SITUATIONS DIFFERENTLY

As I have noted above, this entire hornet's nest could have been avoided if we had left *Jaggers* and its progeny alone, at least until someone came to us with a legally cognizable injury attributable to *Jaggers*. Now that we have gone *en banc*, however, it cannot be gainsaid that Judge Gallagher has assembled an impressive array of authorities for two propositions on which the government relies:

1. that it is not the province of the judge to predict what action the prosecution will or will not take *vis-a-vis* a prospective defense witness;[8] and

2. that the validity of a witness' invocation of the privilege against self-incrimination turns on the legal possibility of prosecution, and not on the question whether, as a practical matter, the witness is likely to be prosecuted.

Formidable as these authorities may seem, however, most of them deal with a situation quite different from the one presented here,

and none is dispositive of our case. As the division majority explained in *Carter I*,

> Judge Gallagher relies on *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir.1958), and on a substantial number of other decisions from various jurisdictions, which would limit the trial judge's inquiry, in assessing a witness' Fifth Amendment claim, to the question whether prosecution of the witness would be legally possible (rather than reasonably possible). The claims of privilege in *Miranti* (and in most of the other cases relied on by Judge Gallagher) were asserted by witnesses whose testimony the government was seeking to compel, and not by prospective defense witnesses. There was thus no actual or potential collision between the rights of an accused under the Sixth Amendment and a witness' privilege against self-incrimination, and there was no occasion for the courts to attempt to balance or reconcile these basic constitutional protections. *Cf. Wilson [v. United States]*, 558 A.2d [1135], 1140 [ (D.C.1989) ] (because forced election between Fifth and Sixth Amendment rights is so painful, courts must attempt to preserve them both to a reasonable extent).

A few courts have followed the analysis utilized in *Miranti* even where the privilege has been asserted by a defense witness whose testimony a criminal defendant has sought to compel. *See, e.g., Commonwealth v. Francis*, 375 Mass. 211, 375 N.E.2d 1221, 1224–25 , *cert. denied*, 439 U.S. 872, 99 S.Ct. 205, 58 L.Ed.2d 185 (1978); *In re Keijam T.*, 226 Conn. 497, 628 A.2d 562, 565–66 (1993). In *Francis*, the court explicitly "reject[ed] the defendant's contention that we should attempt to 'balance' his rights under the Sixth Amendment against his [witness'] decision

---

**6.** The majority states, for example, that if the government denies us immunity because the witness declines to be debriefed, then "prosecutorial *bad faith* would hardly be present...." *Id.* at 343–344 (emphasis added).

**7.** To the extent that the government might object to the *Jaggers* procedure because it contemplated the judge's questioning of prosecutors as to their charging practices, I believe that the court's *Car-*

*ter II* methodology is likely to prove at least as intrusive, if not more so.

**8.** The Supreme Court has recently commented on the difficulties in determining, in the context of an allegedly pretextual traffic arrest, what a police officer "would have" done but for his assertedly improper motive. *See Whren v. United States*, —— U.S. ——, —— – ——, 116 S.Ct. 1769, 1774–76, 135 L.Ed.2d 89 (1996). The present situation is at least somewhat comparable.

to invoke the Fifth Amendment." 375 N.E.2d at 1224. This approach apparently permits a purely theoretical possibility that a witness could be prosecuted to deprive a criminal defendant of potentially exculpatory testimony which may be essential to his defense. *See Wilson, supra,* 558 A.2d at 1140, and authorities there cited; *(James) Harris v. United States, supra,* 614 A.2d [1277,] 1283 n. 10 [ (D.C.1992) ]. 643 A.2d at 358 n. 17.

Some of the decisions on which Judge Gallagher relies are evidently animated by a civil libertarian spirit which would rarely be generated by a case in which the defendant has a palpable need for the witness' testimony, and in which the practical likelihood of the witness' prosecution is nil. The Supreme Court has aptly cautioned that the

> words of our opinions are to be read in the light of the facts of the order under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court.* General expressions transposed to other facts are often misleading.

*Armour & Co. v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944) (emphasis added); *see also Khiem v. United States,* 612 A.2d 160, 164 (D.C.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). I am not at all sure that the courts which decided most of the cases on which the majority relies would rule in the government's favor on facts such as these, in which the defendant's right to a fair trial is implicated, and where the actual likelihood of self-incrimination is remote or even non-existent.

Where the privilege against self-incrimination is the only constitutional protection at issue, it should be accorded the broadest possible scope. If, however, one person's Fifth Amendment protection comes into conflict with another individual's Sixth Amendment right to present a defense, then some reasonable accommodation must be made. "In the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." *Wilson, supra,* 558 A.2d at 1140. Courts should, however, take reasonable steps to avert the crunch.[9] There ought surely to be some "give" at the outer edges of the Fifth Amendment right where the actual danger of self-incrimination is negligible,[10] and where the defendant genuinely needs the evidence in order to receive the fair trial to which he is entitled under the Sixth Amendment.

When a defendant confronts the awesome power and resources of the government in a criminal trial, courts should jealously guard his right to present his defense. He should be denied the right to present relevant exculpatory evidence only upon a showing that his need for that evidence is outweighed by some even more compelling interest. Recently, in *Winfield v. United States,* 676 A.2d 1 (D.C. 1996) (en banc), this court removed one unreasonable impediment—the "clearly link" doctrine—to the vindication of the accused's Sixth Amendment rights. I fear that in the present case, the court has constructed a new such impediment to take the place of the old one.

By the time this case went to trial, the government knew or should have known for years that Craig Carter had been using drugs. In fact, Craig's work release had been revoked on account of such use. His urine tests had been "dirty." The Chief of the Felony Trial Division of the United States Attorney's office candidly advised the trial judge that it was "extremely unusual for the government to ever prosecute misdemeanor drug possessions based on historical testimony." He was right; in more than sixteen years as a judge in the District of Columbia court system, I do not recall hearing of a single case in which the government

---

9. For measures that could have been invoked in this case, *see Carter I,* 643 A.2d at 353–54 ("The Road Not Taken")—a passage which is endorsed by Judge Ruiz in her separate statement, and which apparently is acceptable to the majority. See maj.op. at 342 n. 7.

10. Actually, in light of *Lefkowitz v. Turley, supra* note 1, 414 U.S. at 78, 94 S.Ct. at 322, the danger is evidently not merely negligible, but nonexistent.

did so. Yet, because the theoretical legal possibility of prosecution existed, George Carter was precluded from presenting testimony from Craig Carter which might have cast serious doubt on the credibility of one of George Carter's accusers. A statistically negligible chance of harm to Craig was used to cause real and palpable harm to George.

Somewhere in our hard-nosed judicial landscape of "bright line" rules and "no exceptions"—of "a rose is a rose is a rose, and that, Mr. Defendant, is that"—there ought to be room for a measure of proportionality and for the saving grace of common sense—for a decision, I suggest, like *Jaggers*. Perhaps Mark Antony was right. To paraphrase his famous oration,

> The evil that [cases] do lives after them
>
> The good is oft interred with their [prose]
>
> So let it be with [*Jaggers* ].

WILLIAM SHAKESPEARE, *Julius Caesar*, Act III, Scene 2. All the same, I count myself among those who would like to place a bouquet of forget-me-nots on the *Jaggers* decision's grave.[11]

---

11. If I could set aside my belief that we should not abandon *Jaggers*—a belief that Judge Ruiz unfortunately does not share—I would be sorely tempted to join much of her thoughtful and constructive separate opinion.